B. J. Bᴏʏᴅ, Commissioner.

Unɪᴛᴇᴅ Sᴛᴀᴛᴇs ᴏғ Aᴍᴇʀɪᴄᴀ ᴀɴᴅ ᴛʜᴇ
H. K. Fᴇʀɢᴜsᴏɴ Cᴏᴍᴘᴀɴʏ,

*v.*

B. J. Bᴏʏᴅ, Commissioner.

363 S. W. 2d 193.

(*Nashville,* December Term, 1961.)

Opinion filed December 7, 1962.

140

R. R. KRAMER, JACKSON C. KRAMER, Knoxville, KRAMER, DYE, McNABB & GREENWOOD, Knoxville, of counsel, for Union Carbide Corp. and H. K. Ferguson Co.

LOUIS F. OBERDORFER, U. S. Assistant Attorney General, LEE A. JACKSON, I. HENRY KUTZ, GEORGE F. LYNCH, Attorneys, Department of Justice, Washington, D. C.,

KENNETH HARWELL, U. S. Attorney, Nashville, Tenn., for the United States.

JOSEPH F. HENNESSEY, General Counsel, O. S. HIESTAND, JR., Chief Counsel, Oak Ridge Operations Office, DAVID L. OAKLEY, JR., Oak Ridge, of counsel, for United States Atomic Energy Commission.

GEORGE F. McCANLESS, Attorney General, MILTON P. RICE, WALKER T. TIPTON, Assistant Attorneys General, Nashville, for appellee.

MR. JUSTICE WHITE delivered the opinion of the Court.

These two cases were consolidated and heard by the Chancellor and we shall render one opinion applicable to both cases. These suits were brought to recover certain taxes paid under protest, the taxpayers contending that they are not liable for Sales and Use Taxes under the

Tennessee Retailers' Tax Act as amended. The Chancellor held the appellants were not entitled to recover and dismissed the suits. Appeals have been perfected and five assignments of error are directed to the action of the Chancellor in his order of dismissal.

In the year 1958 Union Carbide Corporation, called Carbide in this opinion, paid under protest the sum of $71,376.36 to the State of Tennessee and appellant, H. K. Ferguson Company, called Ferguson, paid under protest the sum of $12,107.52, both sums asserted by the appellee to be due and owing for Sales and Use Taxes for the month of July, 1956. Upon the payment of said sums each appellant, joined by the United States of America as a co-complainant, brought suit to recover the taxes. The briefs filed by the parties indicate that more than $4,000,000.00 is involved at the present.

It is contended by the appellants that (1) Carbide and Ferguson are agents and not independent contractors of the United States Government; (2, 3) that the taxes imposed are unreasonable and arbitrary and discriminate against the Federal Government; (4) that the Act does not tax use per se of tangible personal property; and (5) that the appellants are expressly exempt from the Sales Tax by virtue of Section 67-3004 T.C.A.

The facts of both suits are rather involved. The appellants contend that they are not liable for the Sales or Use Tax on tangible personal property used by them at Oak Ridge, Tennessee, pursuant to contracts with the Atomic Energy Commission.

The history and background of the Oak Ridge complex and the contract with Carbide was set forth in detail in an earlier case of *Carbide & Carbon Chemicals Corpora-*

*tion v. Carson,* 192 Tenn. 150, at pages 155-159, 239 S.W.2d 27 and, therefore, we do not think it necessary to repeat the same in full here. It is sufficient to say that in 1943 Carbide entered into a contract with the United States Government for the performance of certain experimental and production work at Oak Ridge as a part of a national research and development program whose immediate objective was the development of the atomic bomb.

In 1947 this contract was transferred to the Atomic Energy Commission (A.E.C.) and, as modified by certain supplemental agreement, was in force during the period material to this litigation. Under this contract, Carbide's responsibilities were the management, operation and maintenance of the gaseous diffusion plant, a processing plant for Uranium-235; the Oak Ridge National Laboratory, a nuclear research center; and other important A.E.C. facilities.

The contract was one of many so-called "management contracts" utilized by the A.E.C. to provide the technical and managerial "know-how" needed by the Government in such a large-scale industrial undertaking.

The contract with Ferguson was made in 1956. In this contract Ferguson agreed to perform various and unspecified construction-type activities for the A.E.C. at Oak Ridge, including the building of some new facilities as well as the modification of existing facilities. Such a contract was necessitated by the rapidly changing needs for modifications of the facilities at Oak Ridge that required construction on short notice and adaptability to changes even during the course of a particular construction job.

In many respects the A.E.C. contracts with Carbide and Ferguson are identical, and both are cost-plus-fixed-fee arrangements. The important details of these two contracts will be discussed in this opinion.

We consider the major assignment of error in these consolidated cases to be:

"The Chancellor erred in holding that Carbide & Ferguson were independent contractors under their contracts with the Atomic Energy Commission."

In support of this assignment the appellants contend they are agents of the Federal Government engaged in the exercise of a privilege on behalf of said Government. Therefore, they claim to be immune from state taxation by virtue of Article VI, Clause 2 of the Constitution of the United States, commonly called the "Supremacy Clause", as interpreted in a line of decisions beginning with *M'Culloch v. Maryland*, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579, in which Chief Justice John Marshall denied that the State of Maryland could impose a tax on an instrumentality of the United States stating that:

"The States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequences of that supremacy which the Constitution has declared."

The argument advanced on behalf of the appellants is that as agents of the Government any tax upon them is a direct tax upon the Government and they are, therefore, within the implied immunity of the Federal Government

from state taxation. On the other hand, the appellee vigorously contends that the relationship of appellants with the A.E.C. is that of independent contractors as was held to be the case in a very similar situation in *Carbide & Carbon Chemicals Corporation v. Carson,* supra.

As late as 1936 the United States Supreme Court adhered to a doctrine of absolute immunity, holding that if one sovereign is not subject to direct taxation by another, it also did not have to pay taxes indirectly, as by sales tax levied on private contractors doing business with the Government. *Graves v. Texas Co.,* 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236.

The first change in this attitude appeared in the decision in *James v. Dravo Contracting Company,* 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, handed down in 1937. In that decision a West Virginia sales tax levied on a contractor working for the U.S. was held valid, the Court holding that the contractor was not an instrumentality of the United States and that a tax upon the contractor was not a tax on the Government or its property. Thus simply doing business as contractor with the United States no longer gave immunity.

In 1941, the Court expressly overruled the Graves case, supra, and announced a marked change in the immunity decisions in *Alabama v. King & Boozer,* 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, and the companion case of *Curry v. United States,* 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9. In the first case King & Boozer sold supplies to a cost-plus-fixed-fee government contractor for use in the performance of its contract. The State of Alabama asserted a sales tax which was unanimously upheld by the U. S. Supreme Court, holding that the contractor was not a purchasing

agent for the Government, but was a purchaser in his own name with only the right to be reimbursed under the contract. The Court stated:

"So far as such a nondiscriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties. The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity.

\* \* \* \* \* \*

"They (the contractors) were not relieved of the liability to pay the tax either because the contractors in a loose and general sense were acting for the Government in purchasing the lumber or, as the Alabama Supreme Court seems to have thought, because the economic burden of the tax imposed upon the purchaser would be shifted to the Government by reason of its contract to reimburse the contractors."

In the companion case of *Curry v. United States* the same reason was applied as the Court unanimously upheld an Alabama use tax on material purchased by the contractor outside of Alabama. There the Court emphasized again that "the Constitution without implementation by Congressional legislation, does not prohibit a tax upon Government contractors because its burden is passed on economically by the terms of the contract or otherwise as a part of the construction cost to the Government." 314 U.S. 14, 18, 62 S.Ct. 48, 49.

■ Thus in Dravo and King & Boozer, the Court specifically rejected the earlier "economic burden" test for immunity and replaced it with what has frequently been called the "legal incidence" test. By the latter, if the incidence of a tax is directly upon the U. S. or its agents, it is invalid by implied immunity, while any indirect tax is valid. Under this test the question of agent versus independent contractor becomes decisive.

Ten years after the Alabama cases, this Court was squarely faced with the same question in *Carbide & Carbon Chemical Corporation v. Carson,* supra, in which the Tennessee Sales and Use Taxes were asserted against certain A.E.C. contractors at Oak Ridge, one of whom was the appellant, Carbide in the instant case. In that case the Court said:

"The distinctions between an independent contractor and an agent are not always easy to determine, and there is no uniform rule by which they may be differentiated. 'Generally the distinction between the relation of principal and agent and employer and independent contractor is based on the extent of the control exercised over the employee in the performance of his work, he being an independent contractor if the will of the employer is represented only by the result, but an agent where the employer's will is represented by the means as well as the result.' 2 C.J.S., Agency, sec. 2, p. 1027.

"The distinction generally between an independent contractor and an agent 'depends upon the intention of the parties as expressed in the contract.'" (192 Tenn. page 160, 239 S.W.2d page 31).

After a thorough study of the contracts and the facts involved, this Court held that the parties were independent contractors and were without constitutional immunity, but we also held that they were expressly immune from the taxes under the Atomic Energy Act of 1946, Sec. 9(b), 42 U.S.C.A. sec. 1809(b), [now 42 U.S.C.A. sec. 2208], which provided that the "activities" of the A.E.C. were exempted from taxation in any manner or form by any state or any subdivision thereof.

The U.S. Supreme Court affirmed on the basis of the Atomic Energy Act and, therefore, did not consider the question of implied immunity and relation of the parties. *Carson v. Roane-Anderson,* 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257 (1952).

In many of these cases the Court recognized that Congress could grant express immunity where it chose to do so. An expression of Congressional intent soon followed the Carson case when the legislative branch of the Federal Government amended the Atomic Energy Act by deleting the express immunity granted to A.E.C. "activities". The Senate Report accompanying this legislation reads, in part, as follows:

"The purpose of this legislation is to amend the Atomic Energy Act of 1946, as amended, by striking the last sentence of section 9(b) thereof which, as interpreted by the courts, affords to the Commission, and its contractors, an exemption from State and local taxation broader in scope than that generally enjoyed by all other departments and agencies of the Federal Government, and to place the Atomic Energy Commission on a basis identical to that of the rest of the Federal Government with respect to such taxation."

Thus Congress, mindful of the Federal-State relationship and desirous of maintaining State financial independence, quickly expressed an intent that the A.E.C. would be granted no greater immunity than other federal departments and agencies.

Within a few months after this congressional action, the U. S. Supreme Court handed down its decision in the case of *Kern-Limerick, Inc. v. Scurlock,* 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546 (1954). In many respects this case was closely similar to the King & Boozer case. It involved private contractors in a joint venture who purchased two tractors in Arkansas for use in connection with their contract to build a naval ammunition depot. Arkansas levied a sales tax on the vendor, Kern-Limerick, who sued to recover the taxes. In striking down the taxes as invalid, the U. S. Supreme Court distinguished the case from King & Boozer in the following significant language:

"The contract here in issue differs in form but not in economic effect on the United States. The Nation bears the burden of the Arkansas tax as it did that of Alabama. The significant difference lies in this. Both the request for bids and the purchase order, in accordance with the contract arrangements make the contractors purchasing agents for the Government * * * contain this identical, specific provision:

" '3. This purchase is made by the Government. The Government shall be obligated to the vendor for the purchase price, but the Contractor shall handle all payments hereunder on behalf of the Government. The vendor agrees to make demand or claim for payment of the purchase price from the Government by submitting an invoice to the Contractor. Title to all ma-

terials and supplies purchased hereunder shall vest in the Government directly from the Vendor. The Contractor shall not acquire title to any thereof.' " 347 U.S. 110, 119-120, 74 S.Ct. 403, 409.

The Court then stated that it found the purchaser under this contract was the United States and ruled that King & Boozer was not controlling for, though the Government also bore the economic burden of the state tax in that case, the legal incidence of that tax was held to fall on the independent contractor and not upon the United States.

The Court in that case also said:

"Since purchases by independent contractors of supplies for Government construction or other activities do not have federal immunity from taxation, the form of contracts, when governmental immunity is not waived by Congress, may determine the effect of state taxation on federal agencies, for decisions consistently prohibit taxes levied on the property or purchases of the Government itself." 347 U.S. 110, 122-123, 74 S.Ct. 403, 411.

The general distinction then between these two cases is the finding of an agency relationship between the Government and the contractor for the purchase of materials in the Kern-Limerick case. This finding was based upon (1) the terms of the contract, (2) the terms of the purchase orders, and (3) the actual practice of the Navy to exercise its reserved right to approve each request for bids and each purchase. Emphasis was given to the form of the contract and purchase orders, and any motive to avoid taxation by employing the form used was held immaterial.

Thus the Kern-Limerick case has been called the "outer limit" of the King & Boozer case.

This summary of the decisions has not been exhaustive, nor is the Kern-Limerick case the latest pronouncement on the subject, but it does outline the major steps in recent years. Other cases will be referred to as they apply to the questions presented.

We will now consider the facts and arguments in view of the foregoing background with respect to first the Sales Tax and then the Use Tax. The significance of this separation will appear subsequently. In determining whether or not the Sales Tax applies, it appears that in view of the King & Boozer and the Kern-Limerick cases the question of whether or not these appellants are agents or independent contractors of the A.E.C. appears controlling in considering the validity of the Sales Tax asserted. We shall now proceed to examine the contracts and the procurement methods practiced by the parties. A determination of their intentions expressed therein is necessary for this purpose.

The Carbide contract was supplemented by Agreement No. 37 in June, 1956. It was in effect, a complete re-write of the earlier contract for the purpose of "more clearly reflecting the intent and objectives of the agreement." Carbide states in its brief that this new contract in no way changed the method of operation between the parties. The parts of the contract here pertinent are these. Carbide is charged with the duty of procuring many materials, supplies, and services. It is to exert its best efforts to acquire materials, supplies, equipment and facilities necessary in the performance of the contract, but the Government retains the right to furnish any of these. It

is to be reimbursed for all allowable costs. Payment for allowable costs is to be made with funds advanced by the Government by means of a special bank account. The corporation is not to use its own funds in these procurements. Title to all property passes directly from the vendor to the U. S. Government. These contract provisions appear to be identical with those in effect as early as 1950 or earlier.

Some changes were made in Carbide's purchase operations and order forms in 1954, that is, after the decision in the Kern-Limerick case. Payment is now made with Government funds whereas before the corporation was merely reimbursed. Terms and conditions conforming in many respects with those in the Kern-Limerick decision were added to the order form. At least four types of order forms are used, but no need is seen for distinguishing these. When purchases are made by Carbide the following is included among the terms and conditions attached to the order:

"It is understood and agreed that this Order is entered into by the Company for and on behalf of the Government; that title to all supplies furnished hereunder by the Seller shall pass directly from the Seller to the Government, as purchaser, at the point of delivery; that the Company is authorized to and will make payment hereunder from Government funds advanced and agreed to be advanced to it by the Commission, and not from its own assets and administer this Order in other respects for the Commission unless otherwise specifically provided for herein; that administration of this Order may be transferred from the Company to the Commission or its designee, and in case of such transfer and notice thereof to the Seller

the Company shall have no further responsibilities hereunder and that nothing herein shall preclude liability of the Government for any payment properly due hereunder if for any reason such payment is not made by the Company from such Government funds."

The property was to be shipped to the A.E.C. in care of Carbide. Nowhere in the contract or the purchase order forms is there specific mention of "agency" and with the exception of the above quoted term or condition, the order would have every appearance of being from the Company for itself.

Carbide was generally free to make purchases up to $100,000.00 without prior approval, although this was not true with regard to certain specific items or materials named in the contract.

The Ferguson contract appears to be in every respect identical with that of Carbide in regard to the procurement of materials as shown above.

The procedure and order forms used by Ferguson in purchasing the property herein involved are identical to those of Carbide, except that Ferguson is limited to purchases of $10,000.00 or less without prior A.E.C. approval.

In the King & Boozer case, the important factors in holding that no agency existed and, therefore, upholding the sales tax, were that title passed first to the contractor and that the contractor could not bind the Government. In the instant case neither is true. Here, as in Kern-Limerick, the purchase orders specify that title passes to the Government, that payment is with Government funds, and that the Government is bound by the orders.

The distinguishing factors from Kern-Limerick are that here, as the appellee contends, many purchases are without prior approval and no specific use of the term "agency" or "purchasing agent" appears.

■ The decision of agency or lack of agency does not necessarily rest on these latter decisions. The mere placing of terms such as agent or independent contractor in the contract does not make them such in law. The surrounding facts and circumstances determine the relationship.

■ It appears from the contract and from the actions of the parties that the relationship of agency in so far as the purchase of materials are concerned when accomplished in accordance with the contract bring them within the holding of Kern-Limerick and under that case the A.E.C. is the purchaser. Therefore, the Sales Tax would be a direct tax upon the Government and is invalid under the doctrine of implied immunity, and we so hold.

Next the question of agency or independent contractor is equally important to a determination of the legal incidence of the Use Tax. It is the contention of the appellants that they are not only purchasing agents under their contracts, as we have been compelled to conclude, but that their whole relation to the A.E.C. under the contracts is that of agency. As agents, they argue that they are immune from state taxation of any privilege they exercise in the performance of their contracts.

The appellee again contends that in the general performance of the contracts, the appellants are independent contractors, even if they are agents of the A.E.C. for purchasing purposes.

To determine this question it is necessary to look more fully at the contracts in general.

Article I of the Supplemental Agreement No. 37 with Carbide provides:

"The Government expressly engages the Corporation to manage, operate and maintain the plants and facilities described below, and to perform the work and services described in this contract, including the utilization of information, material, funds, and other property of the Commission, the collection of revenues, and the acquisition, sale or other disposal of property for the Commission, subject to the limitations as hereinafter set forth. The Corporation undertakes and promises to manage, operate, and maintain said plants and facilities and to perform said work and services, upon the terms and conditions herein provided and in accordance with such directions and instructions not inconsistent with this contract which the Commission may deem necessary or give to the Corporation from time to time. In the absence of applicable directions and instructions from the Commission, the Corporation will use its best judgment, skill and care in all matters pertaining to the performance of this contract."

The introductory paragraphs of the contract state that:

"Such agreement arose out of the need for the services of an organization with personnel of proved capabilities, both technical and administrative, to manage and operate certain facilities of the Commission and to perform certain work and services for the Commission, and the Commission recognizes the Corporation as an organization having such personnel, and that the initiative, ingenuity and other qualifica-

tions of such personnel should be exercised in providing such services under the agreement, to fullest extent practicable * * *"

As indicated above, the contract with Ferguson states that it was necessitated by the need for rapid construction or modification of facilities at Oak Ridge. To prevent loss of time the A.E.C. entered into a general construction contract with Ferguson. At intervals not less frequent than six months, the parties were to negotiate supplemental agreements showing precisely what work had been done and fixing Ferguson's fee.

Under each contract, Carbide and Ferguson had the responsibility for hiring their own employees and administering their own contracts, though sub-contracting by Ferguson was subject to some control. Each was advanced funds from which to pay allowable costs, and each received a fixed fee for its performance.

Under the contract the A.E.C. retained the right of approval of certain employees and the right to require dismissal of employees deemed incompetent, careless, insubordinate, or whose employment was inimical with the public interest.

Under Carbide's contract, the A.E.C. controlled the amount of materials to be processed, exercised various controls over special nuclear materials, and approved the type and extent of research work done.

In connection with Ferguson's contract, the A.E.C. handled architect and engineer work separately and controlled the scheduling of specific jobs.

As to both Carbide and Ferguson, the A.E.C. further controlled budgets and financial plans, required detailed accounting, and regulated health and safety procedures.

Looking at the facts presented by this record and at the contracts negotiated by the parties and their intent expressed therein, we have arrived at the same conclusion as we did in the earlier case of *Carbide & Carbon Chemicials Corporation v. Carson,* supra, in which the Court said:

"The nature of the plant operation is such that the government does not have on its staff or in its employ the technical means of qualifications to operate the plant. Each of the production plants is operated by a contractor who has considerable experience in the industrial operation of a chemical separation plant and Gaseous Diffusion plants, electromagnetic separation plants etc. * * *

"We must hold that after making a rather thorough study the contracts * * * and the facts developed in this record that these contractors are independent contractors."

This does not mean that the Carson case is controlling here, but simply that the same conclusion has been reached for the same reasons.

It is clear from this voluminous record in the instant case that many controls are exercised by the A.E.C. over these appellants. The agency argues that the number and extent of these controls clearly indicate an agency relationship. It is, however, the nature of the controls which determine their effect.

Our examination of the record indicates that many of the controls enumerated by the appellants are nothing more than specifications for the "end result". Others are necessitated by the monopoly in atomic development

and the duty to regulate the use of nuclear raw materials vested in the A.E.C.; the need for maximum security; the need for coordination of the Oak Ridge Operation with other A.E.C. projects, and the need for strict accounting for the use of public funds. These factors dictate extensive controls, yet within the framework of these controls the contractors remain independent in the sense that they are free to utilize their own experience and initiative in achieving the objectives or in the result of the Commission. In fact, the A.E.C. lacks the man power and facilities to perform these functions, and it is for this reason it entered into the contracts in question.

The A.E.C. chose to carry out its responsibilities by entering into contracts with private companies, thereby utilizing the extensive technical and managerial skills of these companies in an industrial type activity larger than any previously undertaken by the Government. In the beginning these qualifications were unavailable among Government personnel. The use of private contractors has proven successful and the A.E.C. has elected to continue these relationships.

The record shows that the contract with Ferguson, a long-term contract with one construction company, was made only to allow construction in the least possible time. Just as was Carbide, Ferguson was chosen for its experience and "know-how" in its field and is free to utilize these skills to accomplish the objectives of the A.E.C.

The appellants argue strongly that we are bound to find an agency relationship under our decision in *Roane-Anderson Co. v. Evans,* 200 Tenn. 373, 292, S.W.2d 398. That case, however, is not controlling here. It did involve a similar contract with the A. E. C. at Oak Ridge, but that

contract repeatedly used the term "agent" in describing the relation of the parties. We held that we were not bound by that term but could look beyond it in determining the relation. Furthermore, the tax involved in that case was a gross receipts tax. We held that the receipts collected by Roane-Anderson belonged to the U.S. Government and, therefore, no tax could be levied directly on those funds.

The main contention of the appellants is that we are bound by the decision of the U. S. District Court in *United States v. Livingston,* 179 F.Supp. 9, affirmed without opinion, 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1959). The case involved a South Carolina sales and use tax upon Dupont Corp. in its operations under a similar contract with the A.E.C. We are not persuaded that the holding of that case should be followed here, because both in the facts and the South Carolina and Tennessee taxing statutes substantial differences appear. There DuPont undertook to design, construct, and operate a plant for the A.E.C. for a fee of only $1.00. The Court in that case found that DuPont entered the contract from motives of public responsibility, and that it was the intention of the parties that DuPont would act as agent or "alter ego" of the A.E.C. in that project. The Court concluded that DuPont itself lacked a separate taxable interest.

We do not wish to ignore any patriotic motives that may exist, but we find in this record no indication that the appellant Carbide continues its contract or that appellant Ferguson entered its contract with any primary motive other than that of the normal business transaction. Carbide's yearly fee, above allowable costs, is $2,751,000.00 and Ferguson's fee, negotiated from time to

time, is equally substantial as it appears in the supplemental agreements to the Ferguson contract. In addition, we feel that Carbide, contrary to DuPont in the Livingston case is deriving substantial indirect benefit that will enable it to maintain a position of industrial leadership as atomic energy finds more uses in non-defense fields.

After a very careful and thorough study of the contracts and the facts in this case, we conclude that both Carbide and Ferguson are independent contractors in the general performance of their contracts, though we are compelled, for the reasons shown above, to conclude that they have both been constituted agents for the special function of purchasing or procuring materials under their contracts.

Having decided that, except in the purchase of property, the appellants occupy a position as independent contractors of the A.E.C., the question remains whether the use tax is applicable to them.

In 1955 the Tennessee Retailers' Sales Tax Act was substantially amended by Chapter 242. Prior to that time the use tax in this State was the customary complement to the sales tax which prevented evasion of the sales tax through importation of property from without the state. The 1955 amendments changed this by also taxing use by contractors as a privilege irrespective of the title of the property or its importation. T.C.A. secs. 67-3004, paragraph 2 provides:

"Where a contractor or subcontractor hereinafter defined as a dealer, uses tangible personal property in the performance of his contract, or to fulfill contract or subcontract obligations, whether the title to such prop-

erty be in the contractor, subcontractor, contractee, subcontractee, or any other person, or whether the title holder of such property would be subject to pay the sales or use tax, except where the title holder is a church and the tangible personal property is for church construction, such contractor or subcontractor shall pay a tax at the rate prescribed by sec. 67-3003 measured by the purchase price or fair market value of such property, whichever is greater, unless such property has been previously subjected to a sales or use tax, and the tax due thereon has been paid.''

See also T.C.A. sec. 67-3017, paragraph 11, of which states:

''The term 'dealer' is further defined to mean any person who uses tangible personal property, whether the title to such property is in him or some other entity, and whether or not such other entity is required to pay a sales or use tax, in the performance of his contract or to fulfill his contract obligations, unless such property has previously been subjected to a sales or use tax, and the tax due thereon has been paid.''

The effect of these amendments is strongly challenged by the appellants. One contention is that the Act, as amended, does not tax use per se and does not tax the activities of Carbide and Ferguson described herein. Under their construction of the Act, the use tax therein is nothing more ''than the conventional complementary use taxes''.

Such a construction, however, leaves the 1955 amendments without any force. We do not believe that they were intended as superfluous language or that the

Legislature intended to do an idle thing by adopting said amendments. They expressly impose a tax upon the privilege of use by a contractor of tangible personal property, regardless of the title, where such property has not previously borne a sales or use tax.

■ In T.C.A. sec. 67-3004 a contractor is defined as a "dealer" which is further defined to be a person who uses tangible personal property, whether the title is in him or in another and whether the other has immunity or not in performing his contract, unless the property has borne such a tax. We think this was intended to be and is a tax upon the use per se by such a contractor.

It is complementary to the other provisions of the Act in that it places such a contractor on an equal basis with those who use property which has borne this privilege tax. It prevents private independent contractors from escaping the privilege tax merely because the property used in this private capacity was immune from such a tax when purchased by the Federal Government or its agent. It recognizes that in using the property, the contractor is not different from other private contractors.

The appellants cite examples in the Rules promulgated under the Act which they say exempt use similar to their use of the property in question. The cited instances (such as that a jeweler is not subject to a use tax on a watch when he repairs it) are distinguishable because the exemptions therein are what is commonly known as labor or service charges which are not taxed under this Act. The Rules clearly contemplate that parts replaced and property, such as tools, used in the work shall bear the sales or use tax.

The remaining contentions of the appellants on this point argue in substance that a tax on their use of the property involved is a tax on use by the Government and is thereby unconstitutional. We think that this contention is fully met by our conclusion that the appellants are independent contractors and not agents. Thus the tax is on their private use for their own profit and gain, and not a tax directly upon the Government.

The tax appears to us to be similar in many respects to that upheld by the U.S. Supreme Court in *United States v. Detroit,* 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424, and the companion Michigan cases, *Detroit v. Murray Corp.,* 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441, and *United States v. Township of Muskegon,* 355 U.S. 484, 78 S. Ct. 483, 2 L.Ed.2d 436.

In *United States v. Detroit,* a Michigan property tax was asserted where exempt Government property was leased to a private contractor for use in its business for profit. In upholding the tax the Court said:

" 'Actual possession and custody of Government property nearly always are in someone who is not himself the Government but acts in its behalf and for its purpose. He may be an officer, an agent, or a contractor. His personal advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held.' * * *

"Here we have a tax which is imposed on a party using tax-exempt property for its own 'beneficial personal use' and 'advantage'." 355 U.S. 466, 471-472, 78 S.Ct. 474, 477.

In discussing the measure of the tax the Court said:

"Nevertheless the Government argues that since the tax is measured by the value of the property used it should be treated as nothing but a contrivance to lay a tax on that property. We do not find this argument persuasive. A tax for the beneficial use of property, as distinguished from a tax on the property itself, has long been a commonplace in this country. * * * In measuring such a use tax it seems neither irregular nor extravagant to resort to the value of the property used; indeed no more so than measuring a sales tax by the value of the property sold. * * *

"A number of decisions by this Court support this conclusion. For example in Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9, we upheld unanimously a state use tax on a contractor who was using government-owned materials although the tax was based on the full value of those materials. * * *" 355 U.S. 466, 470, 78 S.Ct. 474, 476.

In *United States v. Township of Muskegon,* the same tax was upheld where the contractor was using the property in the performance of contracts with the Government.

A fortiori we think that a tax upon the privilege of use by a private contractor is not a direct tax upon the Government. Nor do we think that the fact that these appellants are cost-plus-fixed-fee contractors makes their use any less beneficial and advantageous to them.

The appellants also contend that any use by them is within the express exemption of T.C.A. sec. 67-3004, which states:

"Provided, further, that notwithstanding sec. 67-3018, no sales or use tax shall be payable on account of any *direct* sale or lease of tangible personal property to the United States, or any agency thereof created by congress, for consumption or use *directly by it through its own government employees.*" (Emphasis supplied.)

This language contemplates direct sales to the Federal Government under customary procurement and fiscal procedures and the use of property directly by Government employees. By no stretch of the imagination can appellants be considered "employees" of the Federal Government. We hold this statutory exemption has no application to the facts of the cases at bar.

Finally, the appellants contend that the tax imposed discriminates against those who deal with the U. S. Government and, therefore, against the Government itself. They argue that the State of Tennessee and its subdivisions are treated more favorably than the Federal Government. (We do not consider their contentions as to the sales tax since we have held that their purchases are immune.) Viewing the entire Act, we find this contention is without merit. All direct sales to or use by the Government or its agents are expressly exempt. The exemption afforded the State and its subdivision is no broader. T.C.A. sec. 67-3012 provides only that:—"There shall also be exempted all sales made to the state of Tennessee or any county or municipality within the state."

The sole exceptions to the use tax here in question are where a contractor uses church-owned property under a contract for church construction and where a contractor uses state or federally owned property in the construction of electric generating plants. T.C.A. sec. 67-3004.

Clearly this cannot be said to discriminate against the Federal Government. See *United States of America and Olin Mathieson Chemical Corp. v. Department of Revenue of State of Illinois,* D.C., 202 F.Supp. 757, affirmed without opinion 83 S.Ct. 117 (1962). In fact, the A.E.C. contractors receive more favorable treatment because use by them of atomic weapons parts, source materials, special nuclear materials, and by-product materials, as defined by the Atomic Energy Commission Act of 1954, is expressly exempted by T.C.A. sec. 67-3004.

With the exceptions named above, the tax attempts to equate all of those who have a private beneficial use of exempt property with those who use non-exempt property in the same manner. We do not think it is arbitrary or discriminatory.

Consistent with the foregoing, we find that the appellants are purchasing agents for the A.E.C. and, as such, their purchases are exempt from the Sales Tax because they are purchases by the Government. In the general performance of their contracts we find they are independent contractors, and, as such, are taxable on their private use of government-owned property.

After a full consideration of all the assignments of error, we conclude that the order of the Chancellor in dismissing these cases is correct; therefore, his action in so doing is affirmed at the cost of the appellants.