**LOCKHEED MARTIN ENERGY SYSTEMS, INC.**

v.

**Ruth E. JOHNSON, Commissioner of Revenue, State of Tennessee.**

Court of Appeals of Tennessee, at Knoxville.

Jan. 31, 2002.

---

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; and Margaret M. Huff, Assistant Attorney General, for the appellant, Ruth E. Johnson, Commissioner of Revenue, State of Tennessee.

Wayne R. Kramer, Jackson G. Kramer, G. Wilson Horde, Knoxville, Tennessee, for the appellee, Lockheed Martin Energy Systems, Inc.

1. References in the stipulations to "Energy Systems" are to the plaintiff, Lockheed Mar-

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Following an audit by the Tennessee Department of Revenue ("the Department"), the Commissioner of the Department ("the Commissioner") assessed and collected a use tax on computer software fabricated by Lockheed Martin Energy Systems, Inc. ("the Taxpayer"). The Taxpayer responded by filing a complaint seeking a refund of $861,813. The Taxpayer claims that the subject software is exempt from the use tax by virtue of T.C.A. § 67–6–102(25)(B) (1998) as software "fabricat[ed]" by it "for [its] own use or consumption." The trial court agreed with the Taxpayer. We affirm.

### I.

This case was before the trial court on a "Stipulations of Fact." As particularly pertinent to the issues on this appeal, the parties' stipulations provide as follows:[1]

\* \* \*

This cause of action arose as a result of an audit for the period beginning October 1, 1994 through September 30, 1997 ("Audit Period"). Upon completion of the audit for such Audit Period, Energy Systems was notified through a detailed "Proposed Audit Assessment" ("Audit Report") that it was being assessed Tennessee Use Tax ("Use Tax" or "Tax") in connection with computer software which was fabricated exclusively by Energy Systems' employees and used by Energy Systems' employees or others under the direction and control of Energy Systems for the sole purpose of per-

tin Energy Systems, Inc.

forming Energy Systems' obligations under Contract No. DE–AC05–840R21400 described hereinbelow.... Although the audit resulted in a refund to Energy Systems, the amount of such refund was reduced by the [Commissioner] for Use Tax claimed to be due from Energy Systems for its use of the computer software. More specifically, the tax claimed to be due by [the Commissioner] was "offset" against the refund otherwise due to Energy Systems, reducing the refund accordingly.

\* \* \*

At all times relevant during the Audit Period, Energy Systems and the United States Department of Energy ("DOE") were parties to Contract No. DE–AC05–840R21400 ("Contract"). Throughout the Audit Period at issue in this case (i.e., October 1, 1994 through September 30, 1997), Energy Systems operated DOE's Oak Ridge Y–12 Plant site located in Anderson County, Tennessee, and carried out the fabrication and processing of nuclear weapons components and/or parts. Once the weapons' component parts were manufactured, they were shipped to other government facilities for other fabrication into what were ultimately the weapons themselves. Other activities at the Y–12 Plant included the processing of enriched uranium and lithium through a recycle system as a raw material feed stock, the manufacture and production of mock or inert components for use by the Department of Defense in the testing of various delivery vehicles for nuclear warheads, the manufacture and production of test hardware for the nuclear design laboratories for both underground and engineering tests, and the execution of special hardware production for other governmental and certain private entities outside the

Department of Energy known as "work for others." All such work was performed by Energy Systems under the Contract with and approved by DOE. In addition to the Y–12 Plant, Energy Systems also managed and maintained the K–25 Plant site and Oak Ridge National Laboratory ("X–10") in Roane County, Tennessee, under its Contract with DOE during the Audit Period. The K–25 site, known as the Center for Applied Technology, supplied necessary technical and manufacturing support for the Y–12 Plant. In carrying out its responsibilities under the Contract, Energy Systems, through its employees, fabricated computer software. Such computer software was used by Energy Systems' employees or individuals under the direction and control of Energy Systems and was otherwise necessary for Energy Systems to meet its obligations under the Contract and to thereby receive Contract benefits, one of which benefits being Energy Systems'. management fee. Such computer software was fabricated by Energy Systems' employees within the scope of their employment by Energy Systems and was used by Energy Systems' employees or individuals under Energy Systems' direction and control within the scope of their employment by Energy Systems. Work performed at the X–10 site included, among other things, research in the physical, chemical, material and life sciences and in various energy-related technologies. Energy Systems used the software for record-keeping and inventory control.

The computer software fabricated for use by Energy Systems in carrying out and otherwise performing its duties and responsibilities under the Contract was neither fabricated nor used by third party sub-contractors. Nor was such software otherwise procured from third

parties. In all instances, the computer software fabricated, and which has been assessed by the [Commissioner] in this cause, was fabricated by Energy Systems' own employees or individuals under the direction of Energy Systems and used by Energy Systems' employees or individuals under the direction of Energy Systems.

As has been true throughout the term of the Contract, as well as prior Energy Systems' contracts, and as is true with other contractors with DOE, title to all tangible personal property procured or otherwise fabricated by Energy Systems passes immediately to (i.e., vests immediately in) the United States government. Energy Systems acquires no right, title or interest in and to such tangible personal property other than the right to use said property in the performance of its Contract. Included as such tangible personal property in which title vests immediately in the United States government is computer software fabricated by Energy Systems. To the extent Energy Systems procures computer software from third parties or otherwise uses computer software fabricated by third party sub-contractors, it pays the Use Tax thereon; . . . .

Upon termination of its contract with DOE, title to the computer software fabricated by Energy Systems, which software is at issue in this cause, shall remain with DOE and possession shall also remain in DOE.

[The Commissioner] has, based upon the United States Supreme Court decision in *United States v. Boyd*, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), assessed Energy Systems, including the audit period in this cause, Tennessee Use Tax on the use by Energy Systems of tangible personal property owned by the United States government; said Use Tax assessments and/or payments having been made pursuant to the principles of Tenn.Code Ann. § 67–6–209(b) and the Boyd decision (i.e., the use by Energy Systems of tangible personal property owned by the United States government was for the private use and benefit of said taxpayers, and therefore, subject to Tennessee Use Tax).

\* \* \*

(Numbering in original omitted).

## II.

On September 21, 1999, the Taxpayer filed a "Complaint Challenging Assessment for Use Tax" against the Commissioner seeking $861,813, the amount it alleges was wrongfully assessed against it with respect to the subject computer software. It also sought applicable interest, as well as attorney's fees and litigation expenses as "the prevailing party" pursuant to the provisions of T.C.A. § 67–1–1803(d) (1998).[2]

The parties filed cross motions for summary judgment. They agreed in the trial court that there are no disputed material facts. The only disagreement between the parties is as to which of them is entitled to summary judgment.

This case was heard by the trial court on December 11, 2000, on the parties' motions and the Stipulations of Fact. Following argument, the trial court rendered its opinion from the bench, finding that the Taxpayer was entitled to summary judgment. The court found that the subject software falls within the ambit of the exemption at T.C.A. § 67–6–102(25)(B)

---

**2.** The issues of attorney's fees and litigation expenses were not resolved by the trial court; however, the trial court entered its judgment as a final judgment pursuant to the provisions of Tenn. R. Civ. P. 54.02. The propriety of this ruling is not challenged on appeal.

(1998), which provision provides that "... the fabrication of software by a person for such person's own use or consumption shall not be considered a taxable 'use'...." In the course of its opinion, the trial court made the following remarks:

> ... I've looked at the cases and have familiarity with the Boyd case. I'm of the opinion that the exemption applies to the computer software, that the construing of the exemption in the statute that what has occurred here is exactly what the legislature intended and what the exemption provides—that it was fabricated by Lockheed Martin by its own employees for its own use and while title vested with the government, it enabled them to perform their contract, the overall contract, that it was software that was fabricated by Lockheed by its own employees and for its own use, and for that reason plaintiff would be entitled to summary judgment.

### III.

The facts of the instant case directly implicate several provisions of the Retailers' Sales Tax Act, T.C.A. § 67–6–101, *et seq.* ("the Act"). As pertinent to the facts of this case, T.C.A. § 67–6–209(b) (1998) provides as follows:

> Where a contractor or subcontractor ... uses *tangible personal property* in the performance of the contract, or to fulfill contract or subcontract obligations, whether the title to such property be in the contractor, subcontractor, contractee, subcontractee, or any other person, or whether the title holder of such property would be subject to pay the sales or use tax, ... such contractor or subcontractor shall pay a tax at the rate prescribed by § 67–6–203 measured by the purchase price of such property, unless such property has been previously subjected to a sales or use tax, and the tax due thereon has been paid.

(Emphasis added). Another subsection of that code provision makes it clear that the tax contemplated in subsection (b) shall not apply if the taxable event is exempt from such taxation by "any other provision" of Chapter 6, the chapter dealing with the subject of sales and use taxes:

> The tax imposed by this section shall have no application where the contractor or subcontractor, and the purpose for which such tangible personal property is used, would be exempt from the sales or use tax under any other provision of this chapter [6].

T.C.A. § 67–6–209(c) (1998).

In *Commerce Union Bank v. Tidwell,* 538 S.W.2d 405 (Tenn.1976), the Supreme Court determined that "the sale of computer software does not constitute the sale of *tangible personal property* so as to permit its taxation under the act." *See University Computing Co. v. Olsen,* 677 S.W.2d 445, 447 (Tenn.1984). (Emphasis added). This holding was vitiated by subsequent legislative enactments, the history of which is recited in detail in the *University Computing Co.* case. *Id.* at 447–48. As presently enacted at T.C.A. § 67–6–102(25)(B), it is clear that computer software is subject to sales and use tax except to the extent exempted by that provision:

> "Sale" also means such transfer of customized or packaged computer software, which is defined to mean information and directions loaded into a computer which dictate different functions to be performed by the computer, whether contained on tapes, discs, cards, or other device or material. For such purpose, computer software shall be considered tangible personal property; *however, the fabrication of software by a person for such person's own use or consumption shall not be considered a taxable "use"*

*under subdivision (30) or any other section of this chapter;*

T.C.A. § 67–6–102(25)(B) (1998). (Emphasis added).

In *University Computing Co.*, the Supreme Court looked at the language of T.C.A. § 67–6–102(14)(B) (now codified at T.C.A. § 67–6–102(25)(B)) and remarked that it "raises the question whether it was intended that the *use* tax on computer software be done away with." *Id.* at 447. (Emphasis added). The Supreme Court concluded that the *use* of computer software was still a taxable event:

> The Legislative history discloses that the purpose behind the enactment of Chapter 789, Public Acts of 1978, was the elimination of a problem created by the 1977 act. Under the 1977 amendment of the definition of tangible personal property, computer software developed within a company or by a person for personal use could be subjected to use taxation. The purpose of the 1978 amendment was to ensure the exemption of such computer software. Representative S. Thomas Burnett, who was Majority Leader at the time, made statements on the floor of the Tennessee House of Representatives at the time of the enactment of Chapter 789 which clearly reflect that this limited exemption of in-house software was the sole purpose of the act.
>
> > "Mr. Speaker last year we passed legislation affecting computer software which in fact we did not at that time intend to include in-house computer software. This piece of legislation with the amendment that I have will take care of the situation and will remove the in-house computer software ... Mr. Speaker and members of the House, what this amendment is it clarifies and makes certain for all

> times to come that in-house computer software is not in fact taxable."
>
> The question is, then, did the General Assembly accomplish what it intended: exempt computer software made by the user, but continue taxation of its sale or use otherwise. We think it did.

*Id.* 447–48.

■ The Act is a comprehensive taxing statute. "The scheme of taxation is to tax equally all sales of tangible personal property in Tennessee and all those who import and use it." *Creasy Systems Consultants, Inc. v. Olsen,* 716 S.W.2d 35, 36 (Tenn. 1986).

### IV.

■ Our review in this case is controlled by a number of well-established principles. Since the facts are not in dispute, ours is a *de novo* review with no presumption of correctness attaching to the trial court's judgment. *Staples v. CBL & Associates, Inc.,* 15 S.W.3d 83, 88 (Tenn. 2000).

■ Tax statutes are interpreted in the same manner as other statutes; "[w]ords employed by the legislature in the enactment of tax statutes are to be taken in their natural and ordinary sense." *Covington Pike Toyota, Inc. v. Cardwell,* 829 S.W.2d 132, 135 (Tenn.1992). In *Cardwell,* the Supreme Court examined the difference in approach when interpreting taxing statutes as contrasted with exemption statutes. While the statutes in that case are not implicated by the facts of the case now before us, the Court's remarks are pertinent to our resolution of the present controversy:

> Although both of these statutes were first passed in 1963, they were enacted by separate Public Acts at separate times with separate legislative sponsors. Moreover, one is a taxing statute and

the other is an exemption statute. Taxation and exemption statutes are construed differently. Taxation statutes must be liberally construed in favor of the taxpayer and strictly construed against the taxing authority. Conversely, exemptions are construed against the taxpayer, who bears the burden of proving entitlement to the exemption.

*Id.* (Citations omitted).

## V.

Since it is clear that the value of computer software is subject to the Tennessee sales and use tax, the only question for us is whether the exemption from the use tax found at T.C.A. § 67–6–102(25)(B) is implicated by the facts of this case. That exemption has two components: first, "fabrication" of the software by the entity seeking the exemption; and, second, fabrication "for such person's [*i.e.*, the fabricator's] own use or consumption." The statute is clear in its meaning—if either component is missing, there is no exemption. In the instant case, the parties agreed in their stipulations that the Taxpayer fabricated the subject software. Thus, our review is limited to determining whether the software was fabricated "for [the Taxpayer's] own use or consumption." This is the critical language.

The parties' positions on this issue are succinctly stated in the summary of argument section of their respective briefs. The Commissioner asserts the following in her summary:

The Commissioner properly assessed the Taxpayer for its use of computer software pursuant to [T.C.A.] § 67–6–209(b). Although the Taxpayer fabricated the computer software, it is not enti-

tled to an exemption from use tax on the software.

The Taxpayer used the software to perform a contract for a fee. The software was necessary for the Taxpayer to meet its obligations under the contract. Title to the software immediately vested in the Federal Government pursuant to the contract. Title and possession remained with the Government after termination of the contract. Therefore, given these undisputed facts, the Taxpayer's use of the computer software was not for its "own use and [3] consumption" pursuant to [T.C.A.] § 67–6–102(25)(B).

The Taxpayer suggests another approach:

The Commissioner improperly assessed Energy Systems' Use Tax for the use by Energy Systems of computer software fabricated by Energy Systems' employees. The Commissioner's reliance upon *Pan Am World Services, Inc. v. Jackson,* 754 S.W.2d 53 (Tenn.1988) and [T.C.A.] § 67–6–209(b) is misplaced.

For the reasons more fully set forth hereinbelow, including the provisions of [T.C.A.] § 67–6–102(25)(B) and § 67–6–209(c), as well as the long-standing principles enunciated in *United States v. Boyd,* 211 Tenn. 139, 363 S.W.2d 193 (1962), *aff'd* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), computer software fabricated by Energy Systems' employees for use by Energy Systems in the performance of its Contract with DOE is exempt from the Tax. Any other ruling would be inconsistent, not only with such statutory provisions and judicial decisions, but also with the fundamental principles upon which the Tennessee Sales and Use Tax Act ("Act") rests and the very underpinnings upon which such Act stands.

---

**3.** The statute actually speaks in the disjunctive—"own use *or* consumption." (Emphasis

added).

## VI.

We begin our discussion of the legal consequences of the facts in the case at bar by examining the landmark case of *United States v. Boyd*, 211 Tenn. 139, 363 S.W.2d 193 (1962), *aff'd* 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964). *Boyd* dealt with cost-plus-fixed fee contracts between two contractors and the United States Atomic Energy Commission ("the A.E.C."), the predecessor entity to the United States Department of Energy, the governmental department involved in the instant case. Interestingly enough, *Boyd* also dealt with the Federal Government's Oak Ridge facilities, essentially the same facilities involved in the instant case.

In *Boyd*, the contractors and the Federal Government argued that the contractors were "agents of the Federal Government engaged in the exercise of a privilege on behalf of said Government." *Boyd*, 363 S.W.2d at 196. Thus, they argued, the contractors were immune from state taxation by virtue of the Supremacy Clause, Article VI, Clause 2, of the United States Constitution. *Id.*

The Supreme Court rejected this argument. While carving out an exception to its ruling as to purchases made by the contractors when acting as the purchasing agent for the Federal Government—an issue not before us in the instant case—the Tennessee Supreme Court opined that the contractors were independent contractors and not themselves agents of the Federal Government. Thus, the Court affirmed the trial court's ruling that the contractors were subject to the Act. In the course of its opinion, the Tennessee Supreme Court made a number of statements that we think have a bearing on the narrow issue in the instant case:

> The remaining contentions of the appellants on this point argue in substance that a tax on their use of the property involved is a tax on use by the Government and is thereby unconstitutional. We think that this contention is fully met by our conclusion that the appellants are independent contractors and not agents. *Thus the tax is on their private use for their own profit and gain,* and not a tax directly upon the Government.

> \* \* \*

> A fortiori we think that a tax upon the privilege of use by a private contractor is not a direct tax upon the Government. Nor do we think that the fact that these appellants are cost-plus-fixed fee contractors makes *their* use any less beneficial and advantageous to them.

> \* \* \*

> In the general performance of their contracts we find they are independent contractors, and, as such, are taxable on their *private use* of government-owned property.

*Id.* at 204–05. (Emphasis added).

The United States Supreme Court affirmed the ruling of taxability made by the Tennessee Supreme Court. *United States v. Boyd*, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964). As did the Tennessee Supreme Court, the United States Supreme Court, in reaching its decision, stressed that the contractors were using the property sought to be taxed "in connection with [their] *own* commercial activities." *Id.* 378 U.S. at 45, 84 S.Ct. 1518. (Emphasis added). This significant finding is clearly demonstrated in the Court's opinion:

> The Constitution immunizes the United States and its property from taxation by the States, but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise,

is ultimately borne by the United States. Nor is it forbidden for a State to tax the *beneficial use by a federal contractor* of property owned by the United States, even though the tax is measured by the value of the Government's property, and even though his contract is for goods or services for the United States. The use by the contractor for his *own private ends—in connection with commercial activities carried on for profit*—is a separate and distinct taxable activity.

The United States accepts all this but insists that under the present contracts Carbide's and Ferguson's use of government property is not use by them for their own commercial advantage which the State may tax but a use exclusively for the benefit of the United States. Since they are paid for their services only, make no products for sale to the Government or others, have no investment in the Oak Ridge facility, do not stand to gain or lose by their efficient or nonefficient use of the property, and take no entrepreneurial risks, their use of government property, it is claimed, is in reality use by the United States.

We are not persuaded. In the first place, from the facts in this record it is incredible to conclude that the use of government-owned property was for the sole benefit of the Government. Both companies have a substantial stake in the Oak Ridge operation and a separate taxable interest. Both companies maintain a sizable number of employees at Oak Ridge, Carbide some 12,000 men and Ferguson at times over 1,000, and both companies were paid sizable fees over and above their cost, Carbide over $2,000,000 a year. No one suggests that either Carbide or Ferguson has put profit aside in contracting with the Commission, that the fee of either company is not set with commercial, profit-making considerations in mind or that the

operations of either company at Oak Ridge were not an important part of their regular business operations. *"The vital thing" is that Carbide, as well as Ferguson, "was using the property in connection with its own commercial activities."*

*Id.* at 44–45, 84 S.Ct. 1518. (Citations omitted). (Emphasis added).

## VII.

■ The Commissioner seeks to differentiate the computer software in the instant case from what she refers to as "in-house" computer software. This attempted dichotomy is apparently an attempt to exclude the computer software at issue from the software referred to by Representative Burnett as reported in the *University Computing Co.* case. *Id.* at 447–48. ("[I]n-house computer software is not in fact taxable"). Interestingly enough, the parties' stipulations in the instant case reflect that the subject software was used for such mundane things as "record-keeping and inventory control." We do not see how such software is excludable from the software described by Representative Burnett. The Taxpayer utilizes the subject software "in-house" as a part of its business activities. In that sense, it is no different from other "in-house" software such as payroll software or the like.

The Commissioner stresses that the subject software becomes the property of the Federal Government. *Boyd* teaches that this factor does not shield such property from the reach of the state; the Tennessee Supreme Court case of *Pan Am World Services, Inc. v. Jackson,* 754 S.W.2d 53 (Tenn.1988), instructs that title is not determinative as to whether the T.C.A. § 67–6–102(25)(B) exemption applies. *Id.* at 56.

The subject software is being "us[ed]" by the Taxpayer; it is not being used by

the Federal Government. The Federal Government is not performing the work at issue; that work is being performed by the Taxpayer. The Taxpayer has assumed certain obligations and responsibilities under the contract. It uses the subject software to meet and satisfy those obligations and responsibilities. What the Taxpayer does is not unique in the business world. In this aspect of its business, the Taxpayer provides the service of operating facilities owned by another. It "use[s]" personnel and property, including software fabricated by it, to do *its* business, in this case the operation of the facilities for the Federal Government. In our judgment, this fits within the ordinary and usual meaning of the words "for [its] own use or consumption."

We recognize that the exemption at issue must be construed narrowly. We believe that we have complied with this mandate. Just as both opinions in the *Boyd* case stress that the property there was being used by the contractors for their own ends, we find a similar use here. We do not believe that the rationale of *Boyd* can be used to bring the contractors there within the ambit of the taxing authority of the State and be ignored when applying the subject exemption in the instant case. It seems anomalous to us to say, on the one hand, that it is the contractor's use for taxing purposes and then turn around and assert that it is not the contractor's use for the purpose of the exemption.

The Commissioner argues that the decisions in *University Computing Co.*, *Creasy*, and *Pan Am* support her position in the instant case. We disagree.

*University Computing Co.* dealt with the "licensing and sale of computer software." *University Computing Co.*, 677 S.W.2d at 446. While the Court's opinion does not dwell extensively on the facts, it seems clear that this case was a case involving a taxable *sale* and not a taxable *use*.

The facts of the *Creasy* case are in no way similar to the facts of the instant case. In *Creasy*, the taxpayer's "principal activity was the fabrication or modification of computer software *for use by [the taxpayer's] clients on their own computers.*" *Creasy*, 716 S.W.2d at 35. (Emphasis added). *Creasy* simply dealt with the sale of computer software. *Id.* at 37. The issue of use by the taxpayer was not involved.

We do not believe the holding in *Pan Am* is controlling on the facts of the instant case. The taxpayer in that case— Pan Am World Services, Inc.—was neither the fabricator nor the user of the software. *Pan Am*, 754 S.W.2d at 54–55. As we read *Pan Am*, the plaintiff's subcontractor, Computer Scientist Corp., Inc. ("CSC"), fabricated the software and utilized it to perform tasks at the Arnold Engineering Development Center. *Id.* at 54 ("CSC was solely responsible for installing the software and operating the computers."). In the instant case, the Taxpayer was both the fabricator and the user of the subject software. It did not fabricate the software for sale to another nor did it fabricate it for the use of another, either of which events would have rendered the exemption inapplicable. It seems clear to us that the Taxpayer used the subject software for its own use—to operate its business—and, in the process, to operate the extensive government facilities in Oak Ridge. *Pan Am* is not authority for the Commissioner's position in the instant case.

### VIII.

The Taxpayer has clearly demonstrated its entitlement to the exemption. It follows that the Taxpayer is "the prevailing party" as that concept is embodied in T.C.A. § 67–1–1803(d).

## IX.

The judgment of the trial court is affirmed. This case is remanded to the trial court for such further proceedings as may be required, consistent with this opinion.

Costs on appeal are taxed to the Commissioner.