UNITED STATES ET AL. *v.* BOYD, COMMISSIONER.

No. 185. Argued April 20–21, 1964.—Decided June 15, 1964.

*Solicitor General Cox* and *R. R. Kramer* argued the cause for the United States et al. With them on the brief were *Assistant Attorney General Oberdorfer, Philip B. Heymann, I. Henry Kutz, George F. Lynch, Joseph F. Hennessey, Charles W. Hill* and *Jackson C. Kramer.*

*Milton P. Rice,* Assistant Attorney General of Tennessee, argued the cause for appellee. With him on the

brief were *George F. McCanless*, Attorney General of Tennessee, and *Walker T. Tipton*, Assistant Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

In *Carson* v. *Roane-Anderson Co.*, 342 U. S. 232, it was held that § 9 (b) of the Atomic Energy Act [1] barred the collection of the Tennessee sales and use tax in connection with sales to private companies of personal property used by them in fulfilling their contracts with the Atomic Energy Commission. In 1953, Congress repealed the statutory immunity for activities and properties of the AEC contained in § 9 (b) in order to place Atomic Energy Commission contractors on the same footing as other contractors performing work for the Government.[2] In 1955 Tennessee amended its statute by adding a contractor's use tax which imposes a tax upon contractors using property in the performance of their contracts with others, irrespective of the ownership of the property and of the place where the goods are purchased. This tax, at the sales and use tax rate, is measured by the purchase price or fair market value of the property used by the contractor and is to be collected only when a sales tax on local purchases or a compensating use tax on out-of-state goods has not previously been collected in connection with the same property.[3]

---

[1] 60 Stat. 765, c. 724, 42 U. S. C. (1952 ed.) § 1809 (b). The section read in pertinent part: "The Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof."

[2] Act of August 13, 1953, 67 Stat. 575, c. 432.

[3] The Tennessee Retailers Sales Tax Act provides in pertinent part, 12 Tenn. Code Ann. § 67–3004 (1963 Cum. Supp.):

"Where a contractor or subcontractor hereinafter defined as a dealer, uses tangible personal property in the performance of his con-

Union Carbide Corp. and H. K. Ferguson Co. have contracts with the Atomic Energy Commission relating to work and services to be performed at the Oak Ridge, Tennessee, complex. Carbide's contract obligates it to manage, operate and maintain the Oak Ridge plants and facilities in accordance with such directions and instructions not inconsistent with the contract as the Commission deems necessary to issue from time to time. In the absence of applicable instructions, Carbide is to use its best judgment, skill and care in all matters pertaining to performance. Carbide is charged with the duty of procuring materials, supplies, equipment and facilities although the Government retains the right to furnish any of these items. Payment for purchases is to be made with government funds, and title to all property

---

tract, or to fulfill contract or subcontract obligations, whether the title to such property be in the contractor, subcontractor, contractee, subcontractee, or any other person, or whether the title holder of such property would be subject to pay the sales or use tax, except where the title holder is a church and the tangible personal property is for church construction, such contractor or subcontractor shall pay a tax at the rate prescribed by § 67–3003 measured by the purchase price or fair market value of such property, whichever is greater, unless such property has been previously subjected to a sales or use tax, and the tax due thereon has been paid.

.    .    .    .    .

"Provided, further, that the tax imposed by this section or by any other provision of this chapter, as amended shall have no application with respect to the use by, or the sale to, a contractor or subcontractor of atomic weapon parts, source materials, special nuclear materials and by-product materials, all as defined by the atomic energy act of 1954, or with respect to such other materials as would be excluded from taxation as industrial materials under paragraph (c) 2 of § 67–3002 when the items referred to in this proviso are sold or leased to a contractor or subcontractor for use in, or experimental work in connection with, the manufacturing processes for or on behalf of the atomic energy commission or when any of such items are used by a contractor or subcontractor in such experimental work or manufacturing processes."

passes directly from the vendor to the United States.[4] Carbide is generally free to make purchases up to $100,000 without prior approval.

Although Carbide exercises considerable managerial discretion from day to day in performing the contract, the Commission retains the right to control, direct and supervise the performance of the work and has issued directions and instructions governing large areas of the operation. Carbide has no investment in the Oak Ridge facility and at the time of this litigation employed some 12,000 employees and supervisors to perform the contract. Its annual fee, renegotiated periodically, was $2,751,000 at the time of suit.

The Ferguson contract was a contract to perform construction services relating both to new facilities and to the modification of the existing plant. The contract called for performing those projects ordered by the Commission. Ferguson also operated under instructions and directions of the AEC, it owned none of the property used in the performance of its contract and its purchases of property were handled in a manner similar to that

---

[4] The following is included among the terms and conditions attached to the order forms used by Carbide in making purchases:

"It is understood and agreed that this Order is entered into by the Company for and on behalf of the Government; that title to all supplies furnished hereunder by the Seller shall pass directly from the Seller to the Government, as purchaser, at the point of delivery; that the Company is authorized to and will make payment hereunder from Government funds advanced and agreed to be advanced to it by the Commission, and not from its own assets and administer this Order in other respects for the Commission unless otherwise specifically provided for herein; that administration of this Order may be transferred from the Company to the Commission or its designee, and in case of such transfer and notice thereof to the Seller the Company shall have no further responsibilities hereunder and that nothing herein shall preclude liability of the Government for any payment properly due hereunder if for any reason such payment is not made by the Company from such Government funds."

employed in the case of Carbide except that Ferguson was free to purchase without the consent of the Commission only up to $10,000. Ferguson's compensation is negotiated twice a year on the basis of the value of the services Ferguson performed during the preceding six months, a fee of $20,000 having been paid for the six months preceding suit.

Tennessee collected from Carbide and Ferguson a sales and contractor's use tax upon purchases made by them under their contracts with the Commission. The companies and the AEC sued to recover these taxes claiming that their collection infringed upon the implied constitutional immunity of the United States. The Tennessee Supreme Court refused to permit the collection of the sales tax [5] but sustained the collection of the contractor's use tax. This tax, it was held, is imposed upon the use by a contractor of tangible personal property whether the title is in him or in another, and whether or not the other has immunity from state taxation. The contractor's tax "was intended to be and is a tax upon the use per se by such a contractor. . . . [T]he tax is on [his] private use for [his] own profit and gain, and not a tax directly upon the Government." 211 Tenn 139, 163, 164, 363 S. W. 2d 193, 203, 204. We noted probable jurisdiction to resolve another of the recurring conflicts between the power of the State to tax persons doing business within its borders and the immunity of the Federal Government, its instrumentalities and property from state taxation. 375 U. S. 808. We affirm.

---

[5] Relying on *Kern-Limerick, Inc.,* v. *Scurlock,* 347 U. S. 110, the Tennessee court determined that the United States itself was the actual purchaser, and that Carbide and Ferguson acted only as purchasing agents. No question in respect to the correctness of this determination is raised on this appeal and the validity of the contractor's use tax, as against a constitutional claim of immunity, in no way depends on the legality of the sales tax.

The Constitution immunizes the United States and its property from taxation by the States, *M'Culloch* v. *Maryland,* 4 Wheat. 316, but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States. *James* v. *Dravo Contracting Co.,* 302 U. S. 134; *Graves* v. *New York,* 306 U. S. 466; *Alabama* v. *King & Boozer,* 314 U. S. 1. Nor is it forbidden for a State to tax the beneficial use by a federal contractor of property owned by the United States, even though the tax is measured by the value of the Government's property, *United States* v. *City of Detroit,* 355 U. S. 466, and even though his contract is for goods or services for the United States. *Curry* v. *United States,* 314 U. S. 14; *Esso Standard Oil Co.* v. *Evans,* 345 U. S. 495; *United States* v. *Township of Muskegon,* 355 U. S. 484. The use by the contractor for his own private ends—in connection with commercial activities carried on for profit—is a separate and distinct taxable activity.

The United States accepts all this but insists that under the present contracts Carbide's and Ferguson's use of government property is not use by them for their own commercial advantage which the State may tax but a use exclusively for the benefit of the United States. Since they are paid for their services only, make no products for sale to the Government or others, have no investment in the Oak Ridge facility, do not stand to gain or lose by their efficient or nonefficient use of the property, and take no entrepreneurial risks, their use of government property, it is claimed, is in reality use by the United States.

We are not persuaded. In the first place, from the facts in this record it is incredible to conclude that the use of government-owned property was for the sole benefit of the Government. Both companies have a substantial stake in the Oak Ridge operation and a separate

taxable interest. Both companies maintain a sizable number of employees at Oak Ridge, Carbide some 12,000 men and Ferguson at times over 1,000, and both companies were paid sizable fees over and above their cost, Carbide over $2,000,000 a year. No one suggests that either Carbide or Ferguson has put profit aside in contracting with the Commission, that the fee of either company is not set with commercial, profit-making considerations in mind or that the operations of either company at Oak Ridge were not an important part of their regular business operations. "The vital thing" is that Carbide, as well as Ferguson, "was using the property in connection with its own commercial activities." *United States* v. *Township of Muskegon,* 355 U. S. 484, 486.[6]

---

[6] The Government's reliance on *United States* v. *Livingston,* 179 F. Supp. 9, aff'd *per curiam,* 364 U. S. 281, is misplaced. There a South Carolina statute imposed a sales tax and a tax on use, defined as the exercise of any right or power over property "by any transaction in which possession is given," on contractors "purchasing such property . . . as agents of the United States or its instrumentalities." The Government sought to enjoin collection of the tax from the du Pont Company, which performed management services under a contract, similar in many respects to Carbide's, with the AEC. The difference, however, was that du Pont was paid costs plus a nominal fee of one dollar for its entire undertaking. Passing over doubts as to whether the "use tax" was on the contractor's beneficial use rather than on the purchase of property for the Government, the District Court held the sales tax invalid in reliance on *Kern-Limerick, Inc.,* v. *Scurlock,* 347 U. S. 110, and the use tax invalid principally because du Pont entered the contract solely "out of the high sense of public responsibility" and not for profit. The property was therefore not used in du Pont's commercial or business activities. This Court affirmed, 364 U. S. 281, without opinion or citation, on the basis of the jurisdictional papers, which stressed the fact that the ruling below "was based upon a close analysis of the 'extraordinary' contractual relationship between du Pont and AEC at this plant . . ." and the factual determination that du Pont received no benefits from the contract. Because the services involved herein are performed for a substantial fee in the course of the contractor's commercial operation the *Livingston* decision is not controlling.

Secondly, it does not help at all to say that the companies were engaged in furnishing services only, had no investment or risks and made no products for sale to the Government or to others. Undoubtedly a service industry has different characteristics than a manufacturing operation, but the differences are irrelevant for present purposes. The commercial world is replete with profit-making service industries contracting with the Government on a cost-plus basis, using government properties in the performance of the contract and pursuing their own commercial ends within the meaning of *United States v. Township of Muskegon, supra.* Whether manufacturing products for sale to the Government or furnishing services, the cost-plus contractor has undertaken contractual obligations. If he properly performs his contract, he earns his fee; if he does not, he may lose the contract, be liable for damages and be forced to liquidate the organization which was built to perform the contract. Whatever limitations there are on entrepreneurial risks derive from the fact the companies perform under cost-plus-fixed-fee contracts, a widespread method of contracting with the Government. The Government's argument, if accepted, would not only insulate the cost-plus management contractor from state taxation but also those who make products or perform construction work on a cost-plus basis, a result foreclosed by the Court's prior decisions which the Government seems to accept. *Curry* v. *United States, supra; United States* v. *Township of Muskegon, supra.*

In *Muskegon, supra,* the Court remarked that "[t]he case might well be different if the Government had reserved such control over the activities and financial gain of Continental that it could properly be called a 'servant' of the United States in agency terms." The Government urges that this is such a case. According to the Government, this case should be viewed as though the

Commission was doing its own work through its own employees, the legal incidence of the tax therefore falling on it. But, as in *Muskegon,* we cannot believe that either Carbide or Ferguson was "so assimilated by the Government as to become one of its constituent parts." 355 U. S., at 486.

Because of the extraordinary range and complexity of the work to be performed in the research and development of atomic energy, Congress empowered the AEC to choose between performing these undertakings directly, through its own facilities, personnel and staff, and seeking the assistance of private enterprise by means of grants and contracts. Act of August 30, 1954, c. 1073, 68 Stat. 919, 927–928, 42 U. S. C. §§ 2051 (a), 2052. In order to utilize the skill, technical know-how, knowledge and experience of American industry, the Government has, since the inception of the atomic energy program, generally chosen private companies to conduct the various and sundry activities involved in the undertaking, including the management and operation of Atomic Energy plants. See *Carson* v. *Roane-Anderson Co., supra.* As is well stated in the preface to Carbide's contract:

> "[S]uch agreement arose out of the need for the services of an organization with personnel of proved capabilities, both technical and administrative, to manage and operate certain facilities of the Commission and to perform certain work and services for the Commission; and the Commission recognizes the Corporation as an organization having such personnel, and that the initiative, ingenuity and other qualifications of such personnel should be exercised . . . to the fullest extent practicable . . . ."

The help of these companies was not sought merely to supply skilled manpower for employment by the United States and it is not argued that Carbide's 12,000 men have somehow become employees of the Commission rather

than of Carbide. See *Powell* v. *United States Cartridge Co.*, 339 U. S. 497; *Mahoney* v. *United States*, 216 F. Supp. 523 (D. C. E. D. Tenn.). Of course there are governmental directives and instructions which must be obeyed, for the Commission decides the uses of and needs for fissionable material; and, of course, in the sensitive area of atomic energy operations the Commission's controls are subject to modification and change in the light of technical and other developments.[7] But Carbide and Ferguson brought to the Oak Ridge operation both skill and judgment the United States needed and did not have and there is substantial room for the exercise of both, within and without the broad directives issued by the Commission. Should the Commission intend to build or operate the plant with its own servants and employees, it is well aware that it may do so and familiar with the ways of doing it. It chose not to do so here. We cannot conclude that Carbide and Ferguson, both cost-plus contractors for profit, have been so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity.

---

[7] The general purposes of Commission control and direction are stated in the preface to the contract:

"Whereas, the Corporation recognizes that attainment of the Commission's over-all objectives and discharge of its responsibility for economy and efficiency in the conduct of the atomic energy program require the Commission's general direction of the program, supervision of Government-financed activities of organizations managing Commission facilities and related functions so as to assure conformity with applicable law and policies of the Commission, and full access to information concerning such activities; and that the Commission's program of administration under the Atomic Energy Act requires integration and coordination of such activities which the various organizations may be in a position to perform, for the utilization of their services and of information, materials, facilities, funds and other property of the Commission, in the manner most advantageous to the Government."

It is undoubtedly true, as the Government points out, that subjection of government property used by AEC contractors to state use taxes will result in a substantial future tax liability. But this result was brought to the attention of Congress in the debates on the repeal of § 9 (b),[8] which exempted the activities of AEC contractors from state taxation; indeed the AEC argued that the repeal would substantially increase the cost of the atomic energy program by subjecting AEC contractors to state "sales and use taxes" and "business and occupation" taxes.[9] Nonetheless, Congress, well aware of the prin-

---

[8] See S. Rep. No. 694, 83d Cong., 1st Sess., 1–3.

[9] *Id.*, at 4–6. The AEC stated:

"Reducing the Commission's exemption from State and local taxes to the constitutional immunity generally applicable would result in an increase of several million dollars annually in the costs of the atomic energy program, in the form of added State and local taxes borne by the Federal Government. It is apparent that this consideration should not be regarded as decisive since it is the policy of the Federal Government to forego such savings in connection with other Federal activities, as is evidenced by the fact that other components of the Government are exempt from State and local taxation only to the extent of the constitutional immunity as delimited in the King and Boozer decision. We feel, however, that there are special aspects of the impact of the atomic energy program upon the fiscal position of the affected States and localities which should be taken into account in determining whether the broader tax exemption applicable to AEC should be preserved." *Id.*, at 5.

The Commission went on to note that generally its installations had a favorable economic impact in the areas where they were located and where its contractors performed, although it conceded a few special problems in certain small communities. It recommended direct payments by the Government in lieu of property taxes on property acquired by the Commission and the adjustment of internal state-local arrangements to insure that the distribution of revenues would take into account the problems of these special locales. It then added:

"*Eliminating the exemption applicable to sales and use taxes,* to business and occupation taxes, and to the other minor taxes now comprehended by section 9 (b) might not modify the revenues of the

ciple that "constitutional immunity does not extend to cost-plus-fixed-fee contractors of the Federal Government, but is limited to taxes imposed directly on the United States," S. Rep. No. 694, 83d Cong., 1st Sess., 2, repealed the statutory exemption for the declared purpose of placing AEC contractors in the same position as all other government contractors. Act of August 13, 1953, c. 432, 67 Stat. 575.[10] The principles laid down in *King &*

---

few localities burdened by Commission activities . . . ." *Id.,* at 5–6. (Emphasis supplied.)

[10] The purpose of the repeal is well revealed in the following excerpt from the Senate Report:

"The United States Supreme Court in *Carson* v. *Roane-Anderson Co.* (342 U. S. 232 (1952)) interpreted the last sentence of the foregoing subsection as exempting transactions involving certain AEC contractors from the Tennessee sales and use taxes. The Court held that 'activities' of the Commission, as that term is used in section 9 (b), may be performed by independent contractors of the Commission, as well as by its agents, and that, as a consequence, private contractors performing the governmental function under the Atomic Energy Act are within the scope of the section 9 (b) exemption from State and local taxation.

"This decision has the effect of affording the Atomic Energy Commission an exemption from State and local taxation much broader in scope than that available to the other departments and agencies of the Federal Government, which rely only upon the constitutional immunity of the Federal Government for their exemption from taxation. The Supreme Court, in *Alabama* v. *King and Boozer* (314 U. S. 1), established the principle that the constitutional immunity does not extend to cost-plus-fixed-fee contractors of the Federal Government, but is limited to taxes imposed directly upon the United States. Thus, the Atomic Energy Commission's contractors, by reason of the statutory exemption as interpreted by the Supreme Court, are entitled to an exemption from taxation which is not enjoyed by comparably situated contractors of other agencies and departments.

"A number of States have expressed the view that section 9 (b), as interpreted in the Roane-Anderson decision carves out an area of exemption from State and local taxation which deprives State and local governmental units of substantial revenue, particularly in those areas in which the Atomic Energy Commission carries on large scale activities." S. Rep. No. 694, 83d Cong., 1st Sess., 2.

*Boozer, Curry, Esso,* and *Muskegon,* we think, strike a
proper judicial accommodation between the interests of
the States' power to tax and the concerns of the Nation,
they are workable, and we adhere to them. If they
unduly intrude upon the business of the Nation, it is for
Congress, in the valid exercise of its proper powers, not
this Court, to make the desirable adjustment.

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

But for the legislative history set out in the Court's
opinion, *ante,* pp. 49–50, notes 8–10, I would have thought
this case an appropriate one for a thorough reconsidera-
tion of the principles governing federal immunity from
state taxation, a subject which has long troubled this
Court. See my opinion in the "Michigan cases," 355 U. S.,
at 505. In view of the legislative history, I concur in
the judgment and opinion of the Court.