UNITED STATES of America, Plaintiff,

v.

NYE COUNTY, NEVADA, Bernie C. Merlino, Nye County Assessor; Clark County, Nevada; and J.E. Dutton, Clark County Assessor, Defendants.

STATE OF NEVADA, EX REL. Arthur F. WEHRMEISTER, District Attorney of Nye County, Nevada, Plaintiff,

v.

RAYTHEON SERVICES NEVADA, a Delaware corporation, Defendant.

STATE OF NEVADA, EX REL. Arthur F. WEHRMEISTER, District Attorney of Nye County, Nevada, Plaintiffs,

v.

EG & G ENERGY MEASUREMENTS, INC., a Nevada corporation, Defendant.

STATE OF NEVADA, EX REL. Arthur F. WEHRMEISTER, District Attorney of Nye County, Nevada, Plaintiffs,

v.

WACKENHUT SERVICES, INC., a Florida corporation, Defendant.

STATE OF NEVADA, Plaintiff,

v.

REYNOLDS ELECTRICAL & ENGINEERING, et al., Defendant.

Nos. CV–S–94–656–RLH, CV–S–94–675–RLH, CV–S–94–676–RLH, CV–S–94–677–RLH and CV–S–94–678–RLH.

United States District Court, D. Nevada.

Jan. 21, 1997.

Loretta C. Argrett, Gerald A. Role, David M. Katinsky, Alan J.J. Swirski, U.S. Department of Justice, Washington, D.C., Kathryn E. Landreth, United States Attorney, Carlos A. Gonzalez, Asst. U.S. Atty., Las Vegas, NV, for Plaintiffs.

Stewart Bell, District Attorney, Zev E. Kaplan, Deputy District Attorney, Las Vegas, NV, for Clark County & Dutton.

Arthur F. Wehrmeister, Rachel H. Nicholson, Nye County Deputy District Attorneys, Tonopah, NV, for Merlino and Nye County.

Jerald L. Wilkerson, Las Vegas, NV, for Nye County.

Booker T. Evans, Dawson & Associates, Las Vegas, NV, for Wackenhut Services, Inc., Raytheon Services, and EG & G Energy.

### DECISION AND JUDGMENT

HUNT, United States Magistrate Judge.

Nye County, Nevada filed four lawsuits in the State Court of Nevada seeking to compel payment of taxes for the beneficial use of Government-owned property which was being used by contractors on the Nevada Test Site, which spans portions of three Nevada counties. The assessment of taxes is made under NRS §§ 361.157 and 361.159 as they currently read based upon amendments thereto, effective since 1993.

The United States countered in Federal Court by filing suit for a refund of taxes paid to Nye and Clark County, Nevada, by various contractors with the United States Government Department of Energy (DOE) under statutory language of the Nevada Revised Statutes (NRS) existing before 1993. Additionally, the United States seeks declaratory and injunctive relief to prohibit the assessment of taxes pursuant to the statutes changed by amendment in 1993. The United States then filed for removal of the four State Court actions to Federal District Court, where they were ultimately consolidated for trial.

Prior to trial, the Honorable Philip M. Pro granted partial summary judgment, ordering a refund of taxes paid under former (pre–1993) sections NRS 361.157 and 361.159 to Nye and Clark County, but denying the motion in all other respects. It was understood by the parties that the order for partial summary judgment disposed of the matter as to Clark County, Nevada. The remaining issues were tried before this Court.

Nye County, Nevada seeks to enforce its tax assessments against the beneficial use of property, owned by the United States but used by four contractors which are private corporations. These corporations are Raytheon Services Nevada, a Delaware corporation (Raytheon), EG & G Energy Measurements, Inc., a Nevada Corporation (EG & G), Wackenhut Services, Inc., a Florida corporation (WSI), and Reynolds Electrical & Engineering Co., Inc., a Texas corporation (REECO). Pursuant to contracts with the United States, these corporations perform various functions on the Nevada Test Site, including activities in Nye County. These corporations take the position that the United States is contractually or equitably required to indemnify them for any tax obligations incurred as a result of the contracts.

The United States challenges the imposition of a tax (based upon a variety of arguments to be addressed later) and seeks to enjoin the collection of any such taxes assessed in the past or the future. The United States assumed the lead, and role of Plaintiff, joined by the four contractors. Nye County, though the nominal plaintiff in the four removed cases, was the functional Defendant in the trial. This trial was conducted in tandem with a trial of two consolidated cases involving Loral Aerospace Corporation, another United States contractor who has managed and operated various activities for the Air Force in the same general area.

The Court is aware, and indeed it was argued, that a prior case involving Nye County and another contractor, Arcata Associates, Inc., has been tried in this District. For the purpose of distinction, that case may hereafter be referred to as the Arcata Case. The United States won that case and the Nevada tax statutes at issue were held unconstitutional. It was appealed to the Ninth Circuit Court of Appeals which sustained the District Court. *United States v. Nye County Nev.*, 938 F.2d 1040 (9th Cir.1991). That decision was denied *certiorari* by the Supreme Court at 503 U.S. 919, 112 S.Ct. 1292, 117 L.Ed.2d 515 (1992). Since that decision, Nevada has amended its statutes addressing the taxation of otherwise tax-exempt property which is being used by a taxable (i.e., private) entity. The amended statute is challenged in the instant case.

Because part of these cases involve taxes collected under the former statutes, and because all the parties herein argue the applicability of that case to this one (notwithstanding differences in interpretation and application), it is necessary to address the Arcata Case.

The Ninth Circuit held in the Arcata Case that Nevada's prior statute was "an *ad valorem* tax on property of the United States and as such it is unconstitutional." *United States v. Nye*, 938 F.2d at 1043. The Court was clearly correct in its decision as an examination of the language of the statute reveals. The controversy over the applicability of that case to the instant controversy arises from an effort to read more into the decision than exists.

The United States argues that the Arcata Case holds that no beneficial use exists under these circumstances and that using the value of property in evaluating beneficial use is tantamount to an *ad valorem* tax on the property itself. The Ninth Circuit did not say that. To the contrary, it said, "While Nye County could no doubt enact a statute taxing a . . . user's beneficial use of property owned by the United States, **the statute** under which it levied taxes against Arcata is not such a tax measure." *Id.* (emphasis added) Perhaps the United States' misunderstanding comes from the majority opinion's discussion of a very limited number of cases dealing with this issue. In fact, the Ninth Circuit said that the problem was that Nye County made no attempt to segregate and tax Arcata's beneficial use, *Id.*, not that beneficial use did not exist or could not be taxed.

## FACTS

As part of its responsibilities, the Department of Energy (DOE) administers the Nevada Test Site (NTS). The NTS consists of approximately 1350 square miles (864,000 acres) of Government-owned land in Nye County, approximately 65 miles northwest of Las Vegas. This site has been used for the development and testing of nuclear, non-nuclear and other national defense programs. DOE has elected to accomplish some of its tasks by contracting them to private corporations under cost-plus-fee (or award) contracts.

REECO was given the responsibility for construction, drilling operations, housing, food services, and other administrative functions at the sites. EG & G was responsible for scientific data collection and design of diagnostic equipment. Raytheon was responsible for designing underground construction of tunnels, drill holes, etc., and provided design services for surface architectural/engineering projects. Wackenhut (WSI) was responsible for providing security services. As of January 1, 1996, Bechtel Nevada Corporation replaced REECO, EG & G, and Raytheon. Since the 1992 nuclear testing moratorium, the work has diminished from prior years. However, the new Bechtel contract was for $1.5 Billion.

In general, the contract called for payments of costs, plus a base fee, plus an award fee, the latter being calculated on how efficiently or quickly the contractor performed various aspects of the work. While much was said about the fact that the specific corporations, in some instances, were divisions or subsidiaries of their parent corporation, designed or organized specifically and exclusively to work solely on the Test Site in Nevada, all the profits went into the coffers of the parent corporation. Each contractor is a private corporate entity, engaged in a business carried on for a profit, and not an

agency or instrumentality of the United States. Even though much was made at trial about the fact that the amount of work and value of the contracts diminished following the moratorium, the contracts involve substantial amounts of money, even since the moratorium. In these contracts after the moratorium began, the costs alone (comprised primarily of labor costs) have run tens of millions of dollars in the smallest of the contracts to several hundred millions of dollars in the largest of the contracts. Accordingly, the profits, too, are substantial.

The property necessary to carry out the contracts is owned by the United States and provided to the contractors for their use, pursuant to the contracts. The contracts provide authorization or permission to use the Government-owned property (GOP) and place a duty on the United States to provide the property necessary for carrying out the contract provisions. There is a wide variety of types of property, including vehicles for transportation and construction, heavy construction equipment, electronic equipment (used for communications, security, and testing), firearms for security and protection, and buildings for offices, housing, storage, etc. The property is owned exclusively by the United States. It is either furnished by the United States, purchased by the contractor with title passing directly from the vendor to the United States, or, in some instances, built by the contractor with title remaining or ultimately residing in the United States. The property is used exclusively in the performance of the contracts. That is, no contractor uses any of the property for purposes outside the contract.

The contractors do not pay any specified consideration for the use of the GOP and the United States has the unilateral and ultimate authority to suspend a contractor's use of any piece of property or require that it be shared with others. However, the use of the GOP by each contractor is necessary to perform its obligations and earn its fees under its contract and, unless it terminates the contract or any of its provisions, the United States is obligated to provide sufficient property to enable a contractor to carry out its contract. While some equipment may be removed before the end of the contract, whether such equipment is replaced or not, the Court finds that it is foreseeable, by the United States, which property will be necessary and how much the property will be utilized, pursuant to the contract, during the course of each year of the contract. Furthermore, in the day-to-day activities of the contractors, the operators or users of the equipment were not under direct supervision of the United States, but took direction from the contractors and their employees.

For reasons discussion below, this Court finds that the contractors enjoy and receive beneficial use of the property provided for their use in carrying out what are clearly contracts for profit. If the United States had not provided the property, the contractor would have had to, to carry out the contract. Mere title does not alter the beneficial nature of its use.

Taxes were assessed against the contractors, or their predecessors, under the former versions of NRS §§ 361.157 and 361.159. Pursuant to the finding of that statute unconstitutional in the Arcata Case, the Honorable Philip M. Pro granted a motion for partial summary judgment directing a refund of taxes assessed pursuant to those prior statutes. The remaining issues presented to this Court are the assessments and anticipated assessments of taxes under the statutes as amended following the Arcata Case decision.

It does not appear from the documents admitted into evidence that there has been an attempt to tax the beneficial use of land, although there is some reference to buildings, or, perhaps, other structures, which may be situated on real estate. There was no testimony in explanation of what each of those items of property were, although in some cases it is obvious from the declarations. There is, however, an assessment distinction between personal property and realty. The Court concludes that the assessment for "realty" refers to structures rather than land.

## DISCUSSION

### 1. History of Taxable Federal Property

■ In *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819), the Supreme Court

relied on the supremacy clause of the U.S. Constitution, to bar a State from taxing property of the Federal Government. Since that time, however, beginning with *James v. Dravo Contracting Co.*, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155 (1937), there has been a major change in course, resulting in a series of cases which have established the general proposition that if otherwise tax-exempt property (i.e., property owned by the United States) is placed into the hands of a private individual, corporation, or other entity, for its beneficial use or possession, that the beneficial possessory interest or use may be taxed.

Judicial treatment of numerous types of property and beneficial interests and uses have created a meandering path, leaving some uncertainty, but leading toward decreased federal tax immunity. It appears that this trend, if not prompted by, is at least greatly influenced by the United States' increasing practice of turning over its operations and property to private entities rather than using government employees. The result is that the immunity enjoyed by the United States has been dramatically narrowed, and that property is exempt only in situations where the tax falls directly on the United States itself, i.e., federal property, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities. *United States v. New Mexico*, 455 U.S. 720, 735, 102 S.Ct. 1373, 1383, 71 L.Ed.2d 580 (1982). "[A]bsent congressional action, ... the States' power to tax can be denied only under the clearest constitutional mandate." *United States v. San Diego*, 965 F.2d 691, 696 (9th Cir.1992). "In this Court the trend has been to reject immunizing these private parties from nondiscriminatory state taxes as a matter of constitutional law." *United States v. Detroit*, 355 U.S. 466, 474, 78 S.Ct. 474, 479, 2 L.Ed.2d 424 (1958).

While the taxes imposed have been applied to a variety of types of property and in a diversity of ways, it appears from the cases that more often than not, the taxes have been permitted. Beginning with *James*, 302 U.S. 134, 58 S.Ct. 208, above, the Court upheld a state tax on the gross receipts of a contractor providing services to the Federal Government.

In *Curry v. United States*, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9 (1941), the United States purchased certain materials pursuant to a cost-plus contract and shipped them to the contractor to be used in the performance of the contract. The state imposed a use tax on the contractor based on the value of the materials although it was clear it amounted to a tax on the use of government property in performing a government contract.

*United States v. Muskegon*, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436 (1958), upheld the taxation of a manufacturing plant which the United States provided at no cost to a private company to fulfill its contract to produce equipment for the Government.

In *United States v. Detroit*, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), the Court upheld a use tax, which computed the tax amount from the value of the property, on an industrial plant owned by the U.S. Government and leased to a manufacturing corporation. The Court held that using the value of the property as a basis for calculating the amount of a use tax is no different from using the value of property to establish a sales tax.

In *United States v. Boyd*, 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713 (1964), the Court upheld sales and use taxes imposed upon purchases of property, titled in the United States Government, purchased by a contractor using U.S. Government money for the purchase. The fact that the contractor was only providing services was not determinative.

In *Georgia Pacific Corporation v. Mendocino*, 357 F.Supp. 380 (N.D.Ca.1973), the District Court upheld a tax on the possession and use of national forest land where corporations had been granted the right to harvest the timber thereon.

In *United States v. Fresno*, 429 U.S. 452, 97 S.Ct 699, 50 L.Ed.2d 683 (1977) the Supreme Court held that even a U.S. Government employee could be taxed on the beneficial use of housing accommodations provided by the Government for his personal use.

In *United States v. New Mexico*, 455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982) the Court upheld a gross receipts tax on the sale of goods and **services** under management and operations contracts involving three contractors. Two of the contractors had cost-plus-fee contracts. The third contract had no fee, but the Court determined that contractor also received a benefit because it was able to commercially exploit inventions discovered during the scope of its contract.

In *United States v. San Diego*, 965 F.2d 691 (9th Cir.1992) the Ninth Circuit upheld a tax on a private contractor's possession and use of an experimental fusion device, based upon the value of the property, even though the device was owned by the U.S. Government. Even though the court found beneficial possession and use beyond the contract, it also found a beneficial use within the parameters of the contract.

There are also cases, though not as numerous, where the courts have invalidated the imposition of a tax. Of interest, the three cases most often referred to are each from various Circuit Courts of Appeal, not the Supreme Court. However, they are important to note.

In *United States v. Colorado*, 627 F.2d 217 (10th Cir.1980), which preceded the Supreme Court's *New Mexico* decision, the Tenth Circuit struck down a tax charging a contractor for using the entire 6,500 acres of real estate, all the structures, and all the equipment located on the Rocky Flats site in Jefferson County, Colorado. The contractor had a cost-plus-fee contract to operate the Rocky Flats Plant, which is a part of a system of laboratories and plants used to develop and produce nuclear weapons. The trial court held that the Colorado statute, as it was sought to be applied, was unconstitutional. The trial court also noted that the tax was approximately twice the value of the contract and found it unconscionable that the value to

a user would be identical to the value to an owner.

In *United States v. Hawkins County*, 859 F.2d 20 (6th Cir.1988), involving a federal facility of some 6,000 acres, the Sixth Circuit struck down a tax called a "use" tax on the grounds that it was in reality a tax on the real estate and property of the United States. The method of assessment was to take the replacement costs, subtract depreciation and reduce that value by an across the board 40%. The Court held the contractor was taxed beyond the value of his use. The Court concluded that the "substance" of the statute was not to tax the "use" but to lay an *ad valorem* tax on the property of the United States.

And then there is the Arcata Case, *United States v. Nye*, 938 F.2d 1040 (9th Cir.1991), which struck down the statute that formed the basis for Nye County's prior efforts to assess a tax against a contractor at the Nevada Test Site. But for the statute, the contractual arrangements of the contractor there are not unlike those here. The United States argues that the *Nye County* decision goes farther than it actually does.

The *San Diego* decisions [1], which followed, confirm that the *Nye County* decision is limited to the unconstitutionality of the Nevada statute.

In its reference to the Arcata Case in the first *San Diego* decision, the Court said:

In *United States v. Nye County, Nevada*, we held that taxation pursuant to a Nevada **statute was unconstitutional** because it imposed an *ad valorem* tax on property of the government, rather than the contractor's separate private interest in the property. We found that because the **statute** levied a tax on the contractor "in the same amount and to the same extent as though the lessee or user were the owner of the property," it made "no attempt to segregate and tax any possessory interest [the contractor] may have in the property." As such, **the statute** violated the suprema-

---

1. There are two relevant Ninth Circuit cases entitled *United States v. San Diego*. The first, 965 F.2d 691, was decided in May 1992, and remanded the case for a determination on four issues. The last issue, "The Method of Valuation," is important here. The second decision, 53 F.3d 965, was decided in April 1995. This Court may refer to the decisions as the "first" and the "second" *San Diego* decisions.

cy clause. In dicta, we affirmed the power of the state to assess a tax on federally owned tax-exempt property used by a contractor stating that "[w]hile *Nye County* could no doubt enact a statute taxing a lessee's possessory interest in, or a user's beneficial use of, property owned by the United States, **the statute** under which it levied taxes against [the contractor] is not such a tax measure."

*San Diego,* 965 F.2d at 694 (citations omitted) (emphasis added).

The Ninth Circuit then said, in the second *San Diego* case:

> It is not unconstitutional for the County to calculate the value of General Atomics' possessory interest by turning to the value of the nuclear device. *United States v. Detroit,* 355 U.S. 466, 470, 78 S.Ct. 474, 476, 2 L.Ed.2d 424 (1958) ("In measuring [a beneficial use] tax [as opposed to a tax on the property itself] it seems neither irregular nor extravagant to resort to the value of the property used.")

*San Diego,* 53 F.3d at 969.

### 2. *History of the Nevada Tax Statute*

Before discussing the principles and guidance provided in the foregoing cases, let us first examine the former and present Nevada statutes (applying this Court's emphasis, for clarity and to aid in distinguishing the earlier statute from the present one). Prior to 1993, Nev.Rev.Stat. ("NRS") § 361.157 imposed a tax which provided in relevant part:

> When **any real estate** which for any reason is exempt from taxation is leased, loaned or otherwise made available to and used by a natural person, association, partnership or corporation in connection with a business conducted for profit, **it is subject to taxation** in the same amount and to the same extent as though the lessee or user were the owner of the real estate.

Prior to 1993, NRS § 361.159 imposed a tax which provided in relevant part:

> **Personal property** exempt from taxation which is leased, lent or otherwise made available to and used by a natural person, association or corporation in connection with a business conducted for profit **is subject to taxation** in the same amount

and to the same extent as though the lessee or user were the owner of the property ...

The Circuit Court, in the Arcata Case, was clearly correct in finding that the foregoing statutes taxed the **property.** The statutes do not even imply, much less say, that they purport to tax the beneficial use of the property. And, as noted by the *Nye County* Court, "[T]he wording of a tax measure is significant.... [W]hen a statute says it taxes property it probably does. And when it says it doesn't it probably doesn't." *United States v. Nye,* 938 F.2d at 1042.

Now let us examine the new statutes (again with this Court's emphasis, for clarity and distinction). NRS § 361.157(1), the provision at issue, now states:

> When any real estate or portion of real estate which *for any reason* is exempt from taxation is leased, loaned or otherwise made available to and used by a natural person, association, partnership or corporation in connection with a business conducted for profit or as a residence, or both, **the** leasehold interest, possessory interest, beneficial interest or **beneficial use** of any such lessee or user **of the property is subject to taxation to the extent the:**
>
> (a) **portion of the property** leased or used; and
>
> (b) **percentage of time** during the fiscal year that **the property is** leased by the lessee or **used** by the user, can be segregated and identified. The taxable value of the interest or use must be determined in the manner provided in subsection 3 of NRS 361.227.

NRS § 361.159(1), the provision at issue, now provides:

> Except as otherwise provided in subsection 3, **when personal property,** or a portion of personal property, which for any reason is exempt from taxation is leased, loaned or otherwise made available to and **used** by a natural person, association or corporation in connection with a business conducted for profit, **the** leasehold interest, possessory interest, beneficial interest or **beneficial use** of the such lessee or user **of the**

property is subject to taxation to the extent the:

(a) **portion of the property is** leased or **used; and**

(b) **percentage of time** during the fiscal years that **the property is** leased to the lessee or **used** by the user, can be segregated and identified. The taxable value of the interest or use must be determined in the manner provided in subsection 3 of NRS 361.227.

NRS § 361.227(3) now provides:

**The taxable value of** a leasehold interest, possessory interest, beneficial interest or **beneficial use** for the purpose of NRS 361.147 or 181.159 must be **determined** in the same manner **as the taxable value of the property** would otherwise be determined if the lessee or user of the property was the owner of the property and it was not exempt from taxation, except that the taxable value so determined must be **reduced by a percentage** of the taxable value that is **equal to** the:

(a) **percentage of the property** that is **not actually leased** by the lessee or used by the user during the fiscal year; **and**

(b) **percentage of time that the property is not actually used** by the lessee or used by the user during the fiscal year.

The language of the statute as it presently stands, in contrast to the prior language, states that it is taxing the beneficial use and describes how the beneficial use is calculated. While it begins the evaluation with the value of the property (a process upheld by *Muskegon, Detroit, Boyd, New Mexico* and *San Diego*), that figure is reduced to the percentage of the property used and the percentage of time the property is used. The calculations are directed at identifying and segregating the amount of the "use." They are not simply a value (*ad valorem*) tax on the property itself.

. . . .

. . . .

### 3. *The Present Controversy*

The United States argues that the statute is faulty because it does not define "beneficial use" and further argues that there can be no beneficial use if no specific economic benefit obtains outside the contract. The latter argument ignores the law.[2] As to the first argument, it appears to this Court that the phrase is self-defining. It is a use which provides a benefit. It is a use that, but for the permitted use by the United States, the contractor would have to purchase or otherwise obtain the property to carry out the contract. Whether the United States leases or rents the property to the contractor is irrelevant as to whether it is beneficial. Rental value might help by providing a less controversial method of establishing the value of the use, but determining whether there is a beneficial use in the first instance is not governed by whether the contractor leases or pays rent. It is governed by who uses it, and under what circumstances.

In arguing that there must be a commercial benefit outside the contract, the United States misunderstands or misrepresents the prior decisions. In a cost-plus-fee contract, the fee is a profit to the contractor, who is operating a private business for profit. It makes no difference whether the fee is fixed, by a percentage of the costs or otherwise, or varies with the quality of the performance. It is a profit. It constitutes an economic benefit. It is only in cases where there is no fee provided in the contract that the courts have looked beyond the contract to find other benefits. It is the language in these latter decisions which the United States uses to argue that the profit or benefit must be outside the contract.

For example, in *United States v. Muskegon* the contractor was using the plant exclusively in the performance of a contract to manufacture and supply the United States with equipment. In the *Detroit* case, where the goods were sold to others, however, the Court found the benefit by looking outside the contract. In *United States v. Boyd* the

---

**2.** See especially the first *San Diego*, 965 F.2d at 695, and the discussion above, under History of

Taxable Federal Property, together with the discussion of authorities infra.

Court found sufficient benefit within the confines of the management and operations contract itself.

In *United States v. New Mexico,* both situations existed. The taxation was upheld in both situations and all contractors were taxed. There were three contractors involved. Two of the contractors (Zia and LACI) had cost-plus-fee contracts which were held to be sufficient. The third, Sandia, received no fee, but received the benefit of its inventions. The *New Mexico* Court explained and demonstrated that beneficial use (sufficient unto itself) can be found within the provisions of the contract or, if necessary, the benefit can be found outside the contract, if it does not exist within the contract The Court there, in its Footnote 3, 455 U.S. at 724, 102 S.Ct. at 1377 (emphasis added), refers to Sandia's **"additional** benefits" of technical information and expertise. But, noting and quoting the *Boyd* case, which was quoting the *Muskegon* case, it very specifically stated the following:

" '[t]he vital thing' is that [the contractors are] 'using the property in connection with [their] own commercial activities.' " *Id.* [*Boyd,* 378 U.S.] at 45, 84 S.Ct., at 1522, quoting *United States v. Township of Muskegon,* 355 U.S., at 486, 78 S.Ct., at 485. That the federal property involved was being used for the government's benefit—something that by definition will be true in virtually every management contract—was irrelevant, for the contractors remained distinct entities pursing "private ends," and their actions remained "commercial activities carried on for profit." 378 U.S., at 44, 84 S.Ct., at 1521–1522.

*United States v. New Mexico,* 455 U.S. 720, 739, 102 S.Ct. 1373, 1385.

Zia and LACI, of course, receive fixed fees for their services. Sandia does not receive a cash fee, but it obtains obvious benefits from its contractual relationship with the United States. See supra, [455 U.S. at 724, 102 S.Ct.] at 1377, and n. 3. There has been no suggestion ... that Sandia and Western Electric entered into the contract for only altruistic reasons.

*Id.,* at 740 and 102 S.Ct. at 1385.

The Ninth Circuit recognized and noted with approval the foregoing concept, that contractors with cost-plus-fee contracts, operating solely within the parameters of such contracts, were still carrying on "commercial activities carried on for a profit." Cf. *United States v. San Diego,* 965 F.2d at 695.

The United States attempts to buttress its arguments with the facts that all the property was owned and provided by the United States, that it was used exclusively to carry out the contract, that the United States had the ultimate authority to remove property from a contractor's use or reassign it to another contractor, that government officials could commandeer vehicles for temporary use, that there was no benefit to the contractor independent of the contract, that there was no lease or rental agreement for use of the equipment or property aside from the contract, that this was merely a management contract, rather than an operational contract, and that its maintenance responsibilities for fire equipment and maintenance and operation of emergency medical equipment did not provide any value or experience which could be used elsewhere.

These are similar arguments to those made by the dissent in *Muskegon,* and rejected, and describe the circumstances which exist in almost all cases involving cost-plus-fee contracts. They were not persuasive to the Supreme Court. They are not persuasive to this Court.

Such arguments ignore the fact that there is no requirement for a benefit outside the contract. The contract itself, because it provides a profit, amounts to a commercial benefit to the contractor. Else why would the contractor want it? Such arguments further ignore the obvious implication that the awarding and renewing of the contractor's contracts were based upon technical expertise and past performance.

The United States' arguments fly in the face of *Boyd, Detroit, San Diego, New Mexico, Muskegon, James,* and even *Fresno,* notwithstanding the United States' strained efforts to read the "mere use" language of *Fresno,* references in *San Diego* to *Fresno,* and dictum in *Nye County,* to mean that all the other Supreme Court cases, decisions

and reasoning have now been overturned or abandoned. The case law does not support such a labored interpretation of the law.

In view of the foregoing this Court does not find compelling, the United States' arguments, based upon language from *United States v. Fresno,* 429 U.S. 452, 97 S.Ct. 699, 50 L.Ed.2d 683 (1977), that use limited to the activities of a cost-plus contract constitutes "mere use." The *Fresno* case does show that there can be a beneficial use outside of a contract, which is taxable. It also gives guidance regarding valuation (i.e., using the rent which by its nature has incorporated the value of the property). But its value in establishing the existence or identity of beneficial use is limited by the fact that it deals with an employee, not an independent contractor. Independent contractors and employees are treated dramatically different in a wide variety of contexts. One of the reasons is that the employee merely receives a salary. A contractor, whether it is an individual or a corporation, is paid a profit over and above calculations for salary costs.[3]

When a contractor has contracted to maintain a road, it only has mere use of the road. It is not provided for its benefit. Whether there are one hundred miles of road or three miles of road does not affect whether the contractor can fulfill the contract. But whether it has the grading equipment and asphalt machines to maintain any road does affect its ability to fulfill the contract. In the private sector the contractor would purchase the equipment and be taxed on it. Here, the contractor is permitted to use the Government's equipment, but it is obligated to pay the tax on the value of that use. In either case, the value of the equipment is the starting point. In the latter case, it is, or may be, affected by limitations on the portion of the equipment and the amount of time it is used. But, a local entity should not be denied its ability to levy a tax on property or its use merely because the property being used is not in the name of the contractor, but, by the mere provision of a contract, is titled in the name of the United States.

■ The United States argues that Nevada's statute, and the method of valuation used by Nye County, is invalid because it begins the evaluation by establishing property value the same way it would be established for an owner. This, the argument goes, makes it the same as an *ad valorem* tax on the property. That conclusion does not logically follow. Using the same method used to establish value as that used for owners actually accrues to the contractor's benefit because it permits consideration of the life of the property and its depreciation. Otherwise, one might be left with replacement cost which may consider the cost to purchase, or even design and build, a new machine. Furthermore, using the value of the property has often been approved to be an acceptable and logical beginning, though the valuation may not end there, when considering the value of the beneficial use. Considerations of what portion of the property is used and the percentage of time it is used must also be a consideration, as it is under these statutes. But if the property (equipment, vehicles, office or office equipment, etc.) is used entirely by the contractor and is at the contractor's disposal throughout the year, the value of the use of the property may be equal to the value of the property, because the contractor has full use, the same as if it owned it.

Hence, the Court found that a use tax measured by the value of the exempt property was acceptable in *Muskegon,* 355 U.S. at 485, 78 S.Ct. at 484. It also upheld the Michigan statute which provided that the property "shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of such property, . . ." *Detroit,* 355 U.S. at 467,

---

**3.** Arguments that the Government's providing of the equipment necessary to carry out the contract actually reduces the amount of the contract because the contractor could charge an additional amount for profit on the equipment, are disingenuous. If the contractor needs the equipment, he must either purchase it or obtain it from the Government. The fact that the profit amount might be higher if the contractor made the investment itself is irrelevant. Higher profit from providing its own equipment is a function of the contractor's bargaining position before the contract terms are set, not a function of beneficial use during the contract's execution. Whether one arrangement provides "more" benefit than another does not mean that the other is still not a benefit.

78 S.Ct. at 475, stating, "In measuring such a use tax it seems neither irregular nor extravagant to resort to the value of the property used; indeed no more so than measuring a sales tax by the value of the property sold.... In our judgment it was not an impermissible subterfuge but a permissible exercise of its taxing power for Michigan to compute its tax by the value of the property used." *Id.* at 470, 78 S.Ct. at 476.

The Court has also approved the use of the fair market value of property purchased (with Government funds and titled in the name of the Government) for use in carrying out a contract in establishing a sales tax. *Boyd,* 378 U.S. at 40, 84 S.Ct. at 1519. Even in *Fresno,* 429 U.S. at 456, 97 S.Ct. at 701–02, the Court acknowledged, with approval, that the rent for the employee was calculated using the value of the real estate which was being passed on via the rent.

Additionally, the Ninth Circuit's second *San Diego* decision, 53 F.3d 965, 969 states, "It is constitutional for the County to calculate the value of General Atomics' possessory interest by turning to the value of the nuclear device." The Ninth Circuit opinion then cites and quotes from *Detroit* the references made above.

It is only when the valuation begins and ends with the value of the property, and there is no effort to identify the amount of use and the portion of the property used, and calculate that information into the assessment, that the courts have struck down the use tax. Such was the case in *United States v. Colorado,* where the tax was also objectionable to the trial court because it attempted to tax the entire area of land of the facility and the result was a tax in excess of the value of the contract. In *United States v. Hawkins,* the taxing entity made an adjustment for percentage of time of use, but it set an arbitrary percentage rather than making an attempt to determine the actual information as to each piece of property. (It, too, taxed all the land of the facility.) In the

Arcata Case, the former Nevada statute did not even pretend to tax the use. It **stated** it was **taxing the property.** Of course those courts had no difficulty striking those taxation attempts down.

But those conditions are not present here. The request for a declaration of the property used by the contractors specifically requests the time the property was first used and the percentage of use.[4] There do not appear to be any designations of land, though structures of some kind are listed. Unfortunately, only REECO chose to provide information regarding percentage of use, and the valuation of the use was adjusted to reflect the limitations of use. All the other contractors chose to ignore the request for information and responded with their own designations. Furthermore, they all took the position that they had no beneficial use of the property and, accordingly, failed to provide any information which would enable the County to make deductions from the value based upon limitations of use or time of use, except for REECO. Any failure to make the necessary calculations to limit the use (and the corresponding value of the use) must rest upon the shoulders of the contractors, and apparently upon the United States which appears to have directed the contractors to take the position they did.

The United States and the contractors complain that they could not anticipate the amount of time a given piece of property would need to be used over the course of the year. If that is true, one wonders on what basis the contracts were calculated and bid. It defies reason that the parties to the contract had no idea what activities would occur or be performed during the course of the contract (the costs and fees being negotiated on an annual basis), or what labor and machinery requirements those activities would necessitate. Even if estimates are required in certain circumstances, there is no evidence that adjustments or credits in the tax assessed, could not be or would not be made in

---

4. There was testimony and arguments that the work diminished following the moratorium and that several of the contractors shifted their work in part or whole to other states, suggesting they were not using property in Nye County. However, virtually all the declarations of the contractors specifically stated they were identifying property used by each contractor in Nye County during the year in question.

the following year, based upon reports of actual time of use.

Perhaps Nye County's request for the property declaration could be more artfully drawn, but it does ask for the percentage of use. Furthermore, by way of example, it appears REECO had no difficulty understanding the need for, and providing information describing, the percentage of use of property it used, where the use was less than 100%. And with the contractors' uninformative responses, Nye County is certainly in no position to know or be able to estimate that information. Only the contractors, with the possible help of information from the United States, are in a position to provide that information. Except for REECO, they chose not to, instead taking the position, contrary to a long line of cases, that there can be, under no circumstances, any beneficial use of property owned by the United States and used exclusively in the performance of a cost-plus-fee (for profit) contract by a private contractor which was receiving a profit on its activities for the Government. As shown herein that is not the law, despite the United States' efforts to ignore and argue away authoritative and controlling decisions of the Supreme Court which have not been reversed and which continue to be cited and quoted in relevant cases to this day.

There is one area, or type of property, that does not meet the criteria discussed above and should not be taxed. It is an area which is so universally recognized as a governmental function that even in this isolated situation, if there exists the unusual circumstance that the function is provided by a nongovernmental entity, the use of the equipment for the designated purpose does not provide a beneficial use to the entity, but only to the "public." This function is fire protection or suppression. There is listed among REECO's declarations, the Mercury Fire Station, which the Court assumes is a building with the usual fire trucks and other accouterments associated with fire protection and suppression. This item is readily identifiable and can easily be deleted from the assessment roll.

Several other contractors' declarations have a listing under a general heading, "Security and Fire Protection." The declarations do not distinguish between security equipment, which could be alarms, security cameras, electronic eyes, etc., and fire protection equipment, which may be fire trucks, hoses, etc. Or, it may be fire extinguishers, fire or smoke alarms, or other equipment usually installed into buildings by and for private parties. If it is the latter type of equipment, then it might provide a beneficial use just as security equipment does. These items are frequently, even generally, supplied by or purchased by private companies in the course of their operations, and their value is subject to personal or real property taxes, as their use would be here. Except for the Fire Station listed by REECO, the declarations do not distinguish nor identify the property listed under the general and combined heading of "Security and Fire Protection." The Court notes that these general listings for "Security and Fire Protection" represent a minimal assessable value of between $5,000 and $8,000 per contractor.

The statutory and case law supporting the decision of this case would apply to equipment and property which has as its purpose, the maintenance of fire protection or suppression equipment. Such is often contracted out to private entities. The property and equipment actually used for fire protection or suppression is another matter. It is similar to a road for which there is a contract of maintenance. The maintenance equipment would be taxable, but the road itself would not, for it is not "used" to "do" the work, it is only the "object" of the work. It may have been this rationale that gave rise to the "mere use" designation by the *Fresno* Court of the axe or the tower. They are comparable to a fire engine necessary for fire suppression.

However, there is a further reason that fire suppression, and the equipment to carry out the same, should not be taxable, even if one or more of the contractors have a contractual obligation to provide fire suppression. Fire suppression rarely, if ever, is carried on for profit by the private sector. It is almost exclusively a governmental function. As such, it comes within that limited situation described in *New Mexico*, 455 U.S.

at 735, 102 S.Ct. at 1383, where it is an "instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." Unlike medical care, security duties, construction, maintenance, and even the conducting of war games, which have been turned over to private entities who carry out such operations for profit routinely, fire suppression is perceived as a governmental function best left to the government. Indeed, this Court would venture to say that it could take judicial notice of the fact that nowhere in the State of Nevada is fire suppression provided by or under the direction of anyone but various governmental entities.

Accordingly, any tax assessed for fire suppression equipment or its use is not permitted by the law cited above and should be refunded or enjoined.

Accordingly, and for the reasons stated above, it is hereby

ORDERED, ADJUDGED AND DECREED that the Court finds in favor of Nye County and against the United States, Raytheon Services Nevada, EG & G Energy Measurements, Defendant Wackenhut Service, Inc., and Reynolds Electrical & Engineering Co., Inc., and renders judgment as follows:

(1) That the taxes ordered refunded by the order granting partial summary judgment, by the Honorable Philip M. Pro, shall be refunded forthwith.

(2) That the relevant Nevada Revised Statutes, referred to herein, providing taxation of beneficial possession or use of otherwise tax-exempt property are constitutional.

(3) That Defendant Raytheon Services Nevada shall pay Nye County the sum of One Hundred Thirteen Thousand, Nine Hundred Fifty–Eight Dollars and Fifty–Four Cents ($113,958.54), together with interest as provided by law from the date of entry of judgment until paid, and costs as provided by law.

(4) That Defendant EG & G Energy Measurements shall pay Nye County the sum of One Hundred Forty–Five Thousand, One Hundred Twenty–Five Dollars and Eighty–Four Cents ($145,125.84), together with interest as provided by law from the date of entry of judgment until paid, and costs as provided by law.

(5) That Defendant Wackenhut Service, Inc. shall pay Nye County the sum of Twenty–Nine Thousand, Nine Hundred Forty–Eight Dollars and Ninety–Seven Cents ($29,948.97), together with interest as provided by law from the date of entry of judgment until paid, and costs as provided by law.

(6) That Reynolds Electrical & Engineering Co., Inc., shall pay Nye County the sum of Nine Hundred Thirty–Eight Thousand, One Hundred Sixty–Eight Dollars and Twenty–Five Cents ($938,168.25), together with interest as provided by law from the date of entry of judgment until paid, and costs as provided by law.

(7) That the United States and its management and operations contractors are denied an order enjoining Nye County from assessing taxes for the beneficial use of otherwise tax-exempt property as provided by statutes referred to herein, with the possible single exception that property shall not be taxable to the extent it is used to provide fire suppression.

(8) And, that pursuant to the contracts between the United States and the contractors named herein, the United States is obligated to indemnify the aforementioned contractors for any tax obligations, attorney's fees and costs incurred in connection with this litigation.